The UNITED STATES

v.

Geno CHIARELLI, George Albert Jordan, Anthony Durish, Arleigh Halterman.

Appeal of Arleigh HALTERMAN, at No. 89–3563.

Appeal of Geno CHIARELLI, at No. 89–3564.

Appeal of Anthony DURISH, at No. 89–3571.

Nos. 89–3563, 89–3564 and 89–3571.

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1990.

Decided March 14, 1990.

---

Sally A. Frick (argued), Pittsburgh, Pa., for Arleigh Halterman.

Carl Max Janavitz (argued), Pittsburgh, Pa., for Geno Chiarelli.

Thomas W. Brown (argued), Pittsburgh, Pa., for Anthony Durish.

Bonnie R. Schlueter (argued), Asst. U.S. Atty., Paul J. Brysh, U.S. Atty's Office, Pittsburgh, Pa., for appellee.

Before SLOVITER, HUTCHINSON and COWEN, Circuit Judges

## OPINION OF THE COURT

COWEN, Circuit Judge.

Arleigh Halterman, Geno Chiarelli and Anthony Durish appeal from judgments of conviction entered on August 11, 1989. Each challenges the validity of his sentence under the United States Sentencing Guidelines. We will vacate the sentences and remand for resentencing.

### I.

Over the weekend of March 8, 1986, burglars stole sixteen antique Renaissance weapons from a safe deposit box in the

First Seneca Bank at 19 North Main Street in Greensburg, Pennsylvania. The weapons, worth approximately $1,000,000, included several wheel-lock pistols and an Augsburg hunting sword dating from the early part of the fifteenth century. The burglars entered through several large holes they drilled in the bank's ceiling. No one has been charged with the burglary.

Aetna Insurance Company insured the First Seneca Bank against losses due to theft. Karen Weiss, the adjuster assigned to the case, asked Matthew Rich, another Aetna employee, for help in determining the value of the stolen weapons. Rich testified, "It occurred to me that these things were so unique that they were going to be difficult to get rid of. I approached Aetna and asked them if they were interested in obtaining them back, and they said yes." Gov't App. at 10.

On October 10, 1986, Rich spoke to George "Sonny" Jordan about the weapons. Rich spoke to him because Jordan had a reputation for knowing a lot of "criminal elements." Gov't App. at 11. A short time later, Jordan gave Rich three Polaroid pictures of the weapons, which Rich then gave to his superiors at Aetna. Jordan later told Rich that other people were involved, "big-time criminals," Gov't App. at 12, and that he and Rich would get hurt if anyone found out about their association. Gov't App. at 12.

Negotiations between Rich and Jordan in October of 1986 for the sale of the weapons fell through. In July 1987, Jordan asked Rich for descriptions and values of each weapon. Rich said he wasn't sure he could get such information, but he told Jordan he would try. In August of 1987, Rich loaned Jordan a specially prepared album, wiped clean of fingerprints, containing the information he wanted. Gov't App. at 13; Chiarelli Presentence Report (PSR) at 11. When the album was returned, the FBI found a fingerprint on it belonging to Geno Chiarelli. Chiarelli PSR at 11.

In October 1987, Rich met Jordan in Florida and again discussed selling the weapons to Aetna. Gov't App. at 13. On December 9, 1987, Rich told Jordan Aetna would offer $385,000. Rich asked Jordan to check with "his people" if the price was satisfactory. Gov't App. at 16. That night, Jordan called Geno Chiarelli. The next day, Arleigh Halterman called Jordan at his home and Chiarelli immediately afterward. Durish PSR at 12.

On December 11, 1987, Jordan called Rich to tell him that his people had accepted the offer and "were on the road." Gov't App. at 16. On December 12, 1987, Chiarelli rented a Lincoln Town Car to drive to Virginia. Chiarelli, accompanied by Anthony Durish, then drove to Virginia, where they met Jordan. Jordan drove Chiarelli and Durish to Florida in his tractor-trailer truck.

On December 13, 1987, Jordan called Rich to say he and his people were on their way to Florida. Jordan told Rich he wanted the money carefully counted, to make sure there was nothing planted in the money, and discussed washing the money to take off any chemicals it might carry. On December 14, 1987, Rich and Jordan drove to a mall in Florida about a mile from Rich's house. Jordan told Rich that his split of the money would be one eighth, that there were six other people besides Rich and himself, and that each would receive an equal share. Gov't App. at 19. The exchange was scheduled for the next day. Jordan told Rich the weapons would be packaged in a green Army duffel bag. Gov't App. at 20.

On December 15, 1987, FBI agents watched Chiarelli, Jordan and Durish leave their hotel, get in a rented Buick and drive off. Durish carried a briefcase that he put in the trunk. Agents followed them as they drove to the site designated for exchanging the weapons. After a series of maneuvers—parking at a gas station, circling the block, returning to the gas station, visiting a restaurant to make a phone call, and dropping off Chiarelli—Jordan and Durish drove into downtown Tampa. In a shopping mall parking lot at the corner of Buffalo and Albany Streets, they met Chiarelli and Halterman, who were driving a silver Chevrolet van. Durish and Jordan took a large green duffel bag out of

the van and put it in the trunk of the Buick.

FBI agents moved forward and arrested Jordan and Durish. After Jordan consented to a search of their Buick, agents found the duffel bag containing the weapons in the trunk. They also found the briefcase that Durish had carried out of the hotel. It contained three two-way hand-held radios and two radio scanners capable of monitoring radio frequencies used by the FBI and the local police. Gov't App. at 43–47.

When agents approached the silver van, however, Halterman, with Chiarelli in the passenger seat, sped away, driving up on a sidewalk, nearly striking an agent's car, and crossing into oncoming traffic. Agents chased the van at speeds of up to eighty miles per hour until it entered an area near a school and swerved around a bus unloading children. Gov't App. at 49. When agents spotted the van ten minutes later, Chiarelli was no longer inside. Agents resumed the chase, finally trapping the van by sealing off traffic on Florida Avenue in downtown Tampa. Halterman was ordered out of the van and arrested.

Agents searched for Chiarelli in Tampa that afternoon without success. Two days later, Chiarelli surrendered himself at the FBI office in Pittsburgh.

On January 14, 1988, a federal grand jury indicted Chiarelli, Jordan, Durish and Halterman. The indictment charged them with conspiring to receive, possess, conceal and barter stolen property and to transport stolen property in interstate commerce (Count One), receiving, possessing, concealing and bartering stolen property (Count Two) and transporting stolen property in interstate commerce (Count Three).

On May 5, 1988, the district court dismissed the indictment against Jordan because Jordan had been killed in an unrelated car accident.

The case proceeded to trial before a jury against the remaining three defendants on March 14, 1989. At the close of evidence, the court granted Durish a judgment of acquittal on Count Three. On April 5, 1989, Durish and Halterman were found guilty on Counts One and Two. Chiarelli was found guilty on all three counts.

Halterman appeared for sentencing on August 1, 1989. The probation department prepared a presentence investigation report prior to sentence, in which it calculated the guideline range as 21 to 27 months' imprisonment, based on a criminal history category of I (no prior convictions) and a total offense level of 16. The report noted, however, that a departure from the guideline range might be permissible because Halterman had created a risk of harm to innocent people by driving at high speed through residential sections of Tampa, nearly hitting a police car and a school bus. At sentencing, the Assistant United States Attorney argued that the court was permitted to depart from the guidelines because Halterman's attempted escape posed a significant danger to public health and safety.[1] Before imposing sentence, the district court stated:

[T]he Court has considered the discussion here and the arguments of counsel. The Court feels that because of the magnitude of this thievery,—Here, you've got these men down in Florida, trying to sell over a million dollars' worth of guns. Now this is not a petty thing. This is not just an ordinary, run-of-the-mine thievery. This is a thievery of great proportion. They were caught with over a million dollars' worth of stolen property. This property came out of a bank with thick, concrete walls over a foot thick. This thievery was—I'm not saying that

---

**1.** The prosecutor cited guidelines 5K2.14 and 5K2.0 in support of his argument. Those guidelines, in relevant part, provide:

> If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

U.S.S.G. § 5K2.14 (effective Nov. 1, 1987).

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."

U.S.S.G. § 5K2.0 (effective June 15, 1988).

Mr. Halterman was a part of the thievery. I'm just discussing how the bank—the guns got out into the flow of commerce. Somebody had to connect some intricate working. This was a gigantic—This is a thievery of gigantic proportions. This is a very, very sophisticated conspiracy and thievery, and I'm saying specifically Mr. Halterman is not charged with breaking into the bank, nobody ever said that he broke into the bank, but there is evidence that he was associated indirectly with the people who broke into that bank. No doubt about that. They took out of there over a million dollars' worth of guns, plus about $70,000 in cash, and we don't know what else was taken out of there. So this is not just a run-of-the-mine situation. This is something of great, great proportion and gravamen, a thievery of this magnitude, and now that they're down to Florida, they're trying to sell these guns to the insurance company.

Now it seems to me that under these circumstances,—and then you have Mr. Halterman involved in a high-speed chase down through—directly involved in a high-speed chase going down through Tampa and the surrounding environs of Metropolitan Tampa, where he could have killed many children on school buses in and around where he was speeding or trying to escape, endangering the general population in Tampa, people who lived there, the pedestrians, the motorists.

This was a crime of immense proportion, no doubt about it in my mind, and under 5K2 of the General Provisions of this sentencing guideline enactment, that's 18 United States Code 3553(b), this Court is authorized to impose a sentence outside the range established by the applicable guidelines, if the Court finds exists there this [sic] case an aggravating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating these guidelines.

This Court finds that these circumstances I have just recited certainly warrant a departure from the guidelines when you have a theft of this proportion and magnitude, coupled with an attempted flight to flee the scene of the crime which endangered the safety of the general population in and about the City of Tampa, Florida.

Chiarelli App. at 135–37.

The district court imposed concurrent terms of 60 months in prison on Counts One and Two, a $10,000 fine on Count One and a $100 special assessment.

Chiarelli appeared for sentencing on August 2, 1989. The probation department calculated the guideline range in his case to be 27 to 33 months, based on a criminal history category of I and a total offense level of 18.[2] At sentencing, the government argued for an upward departure because Chiarelli was the intended beneficiary of the escape and was therefore equally culpable in endangering public safety. Before imposing sentence, the district court stated:

The Court is of the opinion that the people who are involved in crime usually—and this is my view on it. I do not have necessarily a view that is adopted by other Judges, but I feel that as near as we can under the circumstances, we ought to treat the various participants as equal as possible.

I think more bitterness is caused in the criminal justice system and will be caused by these guidelines as a matter of fact. These guidelines to some extent might be self-defeating.

In this instance, I think I am warranted in treating all of these defendants just about in the same light under all the circumstances as I view the situation.

The court found, and the jury found—let's put it this way. The jury found and the court heard the jury finding that all

---

**2.** Chiarelli received two more points than Halterman. The basis was Chiarelli's leading role in the conspiracy. The government's theory, adopted by the probation department and not challenged on appeal, was that Jordan sought Chiarelli's approval before accepting the $385,000 and that Chiarelli recruited Durish and Halterman to assist in transferring the weapons.

of these people were involved in the conspiracy, and they were all part and parcel of the plan to sell these weapons which were valued in excess of $1,000,000 to anybody who would buy them, these 16 stolen antique weapons.

There is no doubt in my mind that that was the case, as I heard all the testimony and evidence, and the jury has so found.

Here is a case that is a serious case. You are dealing with contraband, stolen property, and that value is of in excess of $1,000,000, because we know that. The insurance company paid the owner $1,000,000.

We know that at least these weapons were valued at that, and the evidence and testimony indicated they were valued of a value even in excess of $1,000,000. This was no small crime.

Secondly, we know, although we do not connect Mr. Chiarelli with the actual breaking into the bank and taking of these weapons out of a thick bank vault, we know that in some manner he was directly or indirectly connected with the theft of these weapons out at the bank in Greensburg where you had walls over a foot thick, and they had to go in there in a sophisticated professional manner and drill holes through that vault; also go in there and disconnect the burglary alarm system.

In other words, this was a sophisticated job done by some person presently unknown, but Mr. Chiarelli was certainly associated in some manner directly or indirectly with the guns in question, because the guns—I think it was a sword—automatically came in his possession.

To use a vernacular expression, this is a big-time theft. This is not little or small. This is something unusual, extraordinary, no doubt about it.

Now, additionally, we did have, as [the prosecutor] has detailed here, and it was detailed in the course of various hearings, a situation where Mr. Chiarelli and Mr. Halterman were engaged in a high speed chase through the metropolitan area of Tampa, Florida, where a loaded school bus was nearly struck by the speeding car.

We had children unloading from this school bus. You had speeds up to 85 miles an hour, no doubt about it. Great risk of harm and danger created by Mr. Halterman, and I can clearly infer with the consent of Mr. Chiarelli who made good his escape from the scene in to the Commonwealth of Pennsylvania, from Tampa, Florida, knowing full well he was a fugitive, knowing full well he was fleeing from the scene of the alleged criminal activity.

The guidelines under grounds for departure state that, as a matter of policy, if the court finds there exists an aggravating circumstance of the kind that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, that those circumstances would warrant a departure from the guidelines, and then we go into Section 5–K–2.14.

We read, if safety was significantly endangered, the court may increase the limits of the guidelines range to reflect the nature and circumstances of the guidelines offense. Here there is no question about the fact.

I will basically depart upward on the basis of the high risk that was created to the safety of the general public and safety of the school children, to the safety of the pedestrians and safety of the motoring public as a consequence of the chase and the high speed movement of Mr. Halterman's car while fleeing from the scene of the alleged criminal activity.

Chiarelli App. at 42–45.

The district court imposed concurrent terms of 60 months' imprisonment on Counts One, Two, and Three, a $10,000 fine on Count One and a $150 special assessment.

Durish was sentenced last, on August 3, 1989. The probation department calculated the guideline range for his case as 15 to 21 months in prison, based on a criminal history category of I and a total offense level of

14.[3] Although neither the probation department nor the United States Attorney recommended departing from the guidelines, the district court did so, imposing concurrent terms of 60 months in prison on Counts One and Two, a $10,000 fine on Count One, and a $100 special assessment. The Court gave an extended statement before imposing sentence, some of which we quote below:

> This gentleman, Mr. Durish, is just as culpable as Mr. Chiarelli and Mr. Halterman in terms of creating a risk. He was in the downtown section of Tampa, transferring guns from vans to Buicks. They were very, very cognizant of the fact that they could be observed.
>
> They are using counter-intelligence, counter-surveillance methods. Mr. Durish, in fact, was using these methods. They knew there was a possibility they could be discovered in the process of transporting these guns in order to make some money out of it, lots of money.
>
> They knew all this. He was part of the creation of the risk that occurred when Mr. Halterman took off in a van with Mr. Chiarelli at breakneck speeds up to 185 [sic] miles an hour, as I recall, through the greater congested metropolitan area. There is no doubt in my mind that he, Mr. Durish, was a part of the group that created this risk.
>
> And these are the circumstances to depart upward. And I am—it is my opinion, there is no doubt about it, that he should be given the same treatment, same departure, the same in every regard that Chiarelli was given and Halterman was given.
>
> He will get a full cut of the proceeds, full cut of the penalty. Same thing. He should not be given any leniency at all. I think the probation office ought to start thinking in terms of things when they review this. This is a serious crime.

> This is big-time criminal action. This is the biggest kind of criminal action you will find in the United States, when people are drilling into vaults and banks and taking things.
>
> . . . .
>
> Now, you know the persons who broke into that vault, they are reasonable, intelligent people. You know and I know that those people who got those $1,200,000 worth of guns did not hand them over to some strangers walking along the street and say, here is $1,200,000 worth of antique guns.
>
> . . . .
>
> This is big, big, big-time criminal activity. I had the occasion to sit on this bench and hear the FBI man at the bond revocation hearing say these people were involved. Chiarelli was involved in the murder, in arson, in vaults, armored cars and trucks. This is what he said. I heard him. He said there is evidence that would warrant him saying that Chiarelli was at least suspected of this type of criminal activity that I cannot describe to you to a greater degree than what I have already done.
>
> . . . .
>
> It is ridiculous to say a departure is not warranted in this case. If there ever was a case, this is the type of case where the laws are—it would be ridiculous to let somebody walk out, away for a few months of incarceration just for this type of organized criminal activity.
>
> And I cannot imagine any worse organization, organized crime like this case, this example of it. No two ways about it. And this organized crime operated here in this case. This is real organized crime.
>
> And the FBI man said some of the people were suspected of arson. I cannot think of anything worse than that,

---

**3.** Durish received two fewer points than Halterman because the probation department found that he had accepted responsibility for his role in the crime. Durish wrote a letter to the court, dated June 2, 1989, in which he wrote, "I fully accept responsibility for my action in aiding the commission of the crime of which I was found guilty."

The United States Attorney asked the district court not to grant Durish the two point deduction and instead requested that his offense level be calculated as 16, with a sentence range of 21 to 27 months.

murder and robbing armored car vehicles.

So there is no doubt in my mind. We will have an upward departure to level 24 like the other three. They will all get an even split, and all ought to get punished under the same circumstances under these circumstances, especially when we already indicated that all of them created a tremendous risk of harm.

Hearing this gentleman's case, I do not know how many children on the school bus could have been killed when this car was careening down the streets of Tampa, Florida, at speeds up to 85 miles an hour, little children that could have been killed over this organized crime activity.

Chiarelli App. at 83–87. In addition, the court stated:

The whole philosophy of these guidelines is warped in my opinion. It is equality of punishment as to each individual crime that is important, not severity of punishment and not as between one crime and another crime.

It is when people are treated equally, when they have all worked together, conspired in criminal activity. That is the important thing in my opinion, contrary to the philosophers who drummed up these sentencing guidelines.

I think they are on the wrong track, and I so state on the record.

Chiarelli App. at 90–91 (emphasis added).

Each defendant appealed, challenging the legality of their sentences under the guidelines. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) (1988). United States v. Denardi, 892 F.2d 269, 271–72 (3d Cir.1989); see also Denardi, 892 F.2d at 274 n. 7 (Becker, J. concurring in part). Each defendant's arguments will be addressed separately.

## II. Arleigh Halterman

Halterman argues that the district court improperly departed from the guideline range on the basis of factors adequately taken into account by the applicable guideline. Our review of a district court's grounds for departure is plenary. See

United States v. Uca, 867 F.2d 783, 786 (3d Cir.1989).

A sentencing court may not impose a sentence that departs from the guideline range unless the court finds "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b) (1988); see also U.S.S.G. § 5K2.0 ("Grounds for Departure") (effective June 15, 1988). No departure is permitted on the basis of circumstances adequately taken into consideration by the Sentencing Commission. Uca, 867 F.2d at 786.

In departing, the district court relied in part on guideline 5K2.14, which provides:

If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

U.S.S.G. § 5K2.14 (effective Nov. 1, 1987).

The prosecutor argued, and the district court agreed, that departure from the guidelines was warranted under 5K2.14 because Halterman's attempted escape at high speed in the van had significantly endangered the safety of the residents of metropolitan Tampa.

Halterman argues on appeal that the guideline covering receipt of stolen property, U.S.S.G. § 2B1.2 (effective June 15, 1988), adequately accounts for the danger to the public arising from escape. He bases his argument on section 1B1.3(a) of the guidelines, which provides:

Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1) all acts and omissions committed or aided and abetted by the defendant ... in the course of attempting to avoid detection or responsibility for that offense....

(2) ....

(3) all harm or risk of harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above....

U.S.S.G. § 1B1.3(a) (effective Jan. 15, 1988).[4] Halterman argues that section 1B1.3 is the Sentencing Commission's statement of the kinds of conduct it took into account in formulating each guideline. He argues therefore that the guideline governing receipt of stolen property, section 2B1.-2, implicitly accounts for any danger to the public arising from an escape during commission of the crime.

Halterman has misread the guideline. Section 1B1.3 is a guide for the sentencing court. It permits the sentencing court to consider a wide variety of conduct, including attempted escape, in determining the base offense level, the specific offense characteristics, cross references and adjustments. It also permits consideration of any risk of harm arising out of the crime or escape. U.S.S.G. § 1B1.3(a)(3) & comment. (n. 4) (effective Jan. 15, 1988). This does not necessarily mean that the Sentencing Commission, in formulating each guideline, considered the risk of harm arising from a particular crime. On the contrary, Application Note 4 to section 1B1.3 expressly states, "When not adequately taken into account by the applicable offense guideline, creation of a risk may provide a ground for imposing a sentence above the applicable guidelines range."

■ Section 2B1.2, under which the defendants were sentenced, takes no account of any risk of harm that might arise from receiving stolen property. The guideline specifies many different base offense levels, graded according to the value of the property stolen. The base offense level does not vary according to the risk of harm arising from commission of the crime. Similarly, the guideline lists several specific offense characteristics that add or subtract points from the base offense level. Risk of harm is not included among them. Since risk of harm is not adequately taken into account by the guideline applicable to receipt of stolen property, it would be a proper basis for upward departure. The sentence was proper in this respect.

■ The district court also stated, however, that it was departing upward on the basis of "the magnitude of the thievery." This was error. The guideline governing receipt of stolen property explicitly provides for increasingly greater base offense levels, hence increasingly greater punishment, depending on the value of stolen property received. *See* U.S.S.G. §§ 2B1.-2(b)(1), 2B1.1(b)(1) (effective June 15, 1988). The enormous value of the stolen weapons was already taken into account in the guideline range calculated under 2B1.2 and, therefore, could not be a proper basis for departure.

■ The sentencing court also commented that Mr. Halterman must have been connected in some manner to the thieves. Chiarelli App. at 136. This is true in every case of receiving stolen property. The connection between those who steal property and those who receive it is inherent in the crime. It is already taken into account by the guideline for receipt of stolen property and therefore may not form a basis for departure. Furthermore, there is no basis in this record for asserting that Halterman was so closely connected with the thieves that this element is present to a degree not adequately taken into account by the guideline.

4. Congress amended section 1B1.3(a) effective November 1, 1989 to eliminate the "risk of harm" language as unnecessary, since the guidelines for particular crimes, such as arson, explicitly account for risk of harm. United States Sentencing Commission, Guidelines Manual at C.41 (1989).

Application Note 4 to the newly amended 1B1.3, however, still states that risk of harm would form a proper basis for departure if the risk is not adequately taken into account by the applicable guideline. *See* U.S.S.G. § 1B1.3 comment. (n. 4) (effective Nov. 1, 1989).

In addition, the law requires the sentencing court to consider only the guidelines and policy statements in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4) & (a)(5) (1988). The November 1, 1989 amendments were not in effect on the sentencing dates in this case. In any event, in this case, the amended guidelines do not require a different result than the guidelines in effect on the date of sentence.

Halterman also argues the magnitude of the departure here was unreasonable. Given our disposition of his case, *see infra* section V, we need not address this argument.

### III. Geno Chiarelli

#### A.

Chiarelli, like Halterman, argues that the district court erred in departing from the guidelines. The district court explicitly relied on the danger to safety caused by the high speed escape as a basis for departure. It also discussed at length the great value of the stolen weapons and Chiarelli's connection with sophisticated bank burglars.

Chiarelli argues that he cannot be held accountable for Halterman's dangerous driving. In determining the applicable guideline range, a sentencing court may consider all acts and omissions of a defendant, including conduct "for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1) (effective Jan. 15, 1988). If the risk or danger of harm arising from such conduct is not adequately taken into account by the particular guideline, then it may form the basis for a departure. U.S.S.G. § 1B1.3 comment. (n. 4); 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.

According to the commentary as it stood on the date of Chiarelli's sentencing, in cases of conspiracy, conduct "for which the defendant would be otherwise accountable" includes "conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant."

U.S.S.G. § 1B1.3 comment. (n. 1) (effective Jan. 15, 1988).[5]

Chiarelli did not drive the van. He was a passenger, however, and certainly knew that Halterman was driving dangerously. Chiarelli argues that the evidence surrounding the escape could support the conclusion that he wanted no part of Halterman's recklessness. The district court, on the contrary, drew an inference that Chiarelli consented to Halterman's driving in order to escape from authorities. The district court's finding is not clearly erroneous. That Chiarelli was a passenger in the van and managed to escape because of Halterman's driving is sufficient ground for drawing such an inference. Having consented to a high speed escape in downtown Tampa, Chiarelli must be held to have reasonably foreseen the danger involved. He is therefore accountable for Halterman's dangerous driving.

As discussed above, significant danger to public safety is an appropriate basis for upward departure in this case. The district court, however, was obviously concerned with a number of other factors that were not permissible bases for departure. As explained above, the great value of the weapons and the "association" between Chiarelli and the sophisticated burglars who stole the weapons are already adequately taken into account by the receipt of stolen property guideline.

#### B.

Chiarelli contends that the district court erred in refusing to consider his mili-

**5.** This note was subsequently amended, effective November 1, 1989, to read:

In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly undertaken criminal activity that was reasonably foreseeable by the defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

U.S.S.G. § 1B1.3 comment. (n. 1) (effective Nov. 1, 1989).

The law *sensibly* requires that the sentencing court consider only the policy statements (of which commentary are one example) in effect on the date of sentencing. 18 U.S.C. § 3553(a)(5) (1988). The new commentary was not in effect on August 1, 2 or 3 of 1989 and consequently the district court need not have considered it.

The new commentary would not require a different result, however, since the district court found that Chiarelli consented to the high speed escape. Having consented, he must reasonably have foreseen that an escape at high speed in downtown Tampa would endanger the safety of the residents.

tary record. He enlisted in the United States Marine Corps on August 16, 1961, and was honorably discharged on August 16, 1965. Chiarelli PSR at 18. He spent approximately eighteen months in Okinawa and was a lance corporal at the time of his discharge. *Id.*

Chiarelli does not argue the guidelines required the district court to consider his past military service. The guidelines nowhere mention military history. Chiarelli argues instead that the district court's refusal to consider his military history as a basis for departure denies him due process of law. He cites *United States v. Pipich*, 688 F.Supp. 191, 193 (D.Md.1988), in which the court wrote, "a criminal defendant is entitled to due process in sentencing, which includes consideration of the factors peculiar to him or her that are relevant to the exercise of judicial discretion." *Pipich*, 688 F.Supp. at 193. The argument, in essence, posits a substantive due process right to individualized treatment in sentencing. This argument has no vitality after our decision in *United States v. Frank*, 864 F.2d 992, 1009 (3d Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989).

The district court did not err in refusing to consider Chiarelli's military history.

## IV. Anthony Durish

### A.

Anthony Durish, like Halterman and Chiarelli, argues the district court erred in departing from the guidelines in his case. We agree. As discussed above, the danger to public safety caused by the high speed escape was a proper basis for departing upward in Halterman's and Chiarelli's cases. In Durish's, it is not.

The question is whether Durish is accountable for Halterman's actions. According to the commentary following section 1B1.3, in a case of conspiracy, a defendant is accountable for the conduct of others that was in furtherance of the conspiracy and was known to or reasonably foreseeable by the defendant. U.S.S.G.

§ 1B1.3 comment. (n. 1) (effective Jan. 15, 1988).

Durish did not drive the speeding van. Unlike Chiarelli, he did not ride in it, nor are there any circumstances from which to infer that he agreed to a high speed escape. The question is whether Durish, in agreeing to assist the sale of the stolen weapons, reasonably should have foreseen that Halterman and Chiarelli would attempt to escape at high speed through Tampa, in the process reaching speeds of 80 miles per hour and nearly hitting a police car and a bus full of school children.

The government argues that in nearly all crimes, each participant must reasonably foresee a possibility of being caught. The probability of capture is enhanced when the defendants plan to transfer $1,000,000 worth of stolen weapons in a public parking lot in broad daylight in a densely populated city. Thus, the government argues, the possibility of the need for escape reasonably should have been foreseen by all participants. Given that escapes must often be speedy, and given the crowded landscape of Tampa, the government finally argues that the danger posed by such an escape should also be foreseeable.

It may be true, although we do not decide, that the danger posed by the escape was "reasonably foreseeable" in the sense those words are used in the law of torts. We do not think that suffices for purposes of the Sentencing Guidelines. This is not a case of armed robbery, in which the risk of harm is closely connected with the crime. Those who agree to rob a bank at gun point must reasonably foresee some danger to the public from their actions. Those who agree to barter stolen weapons may reasonably foresee absolutely no risk of physically harming others by their actions. There is evidence that Durish carried hand-held radios and police scanners, suggesting that he foresaw the possibility that he, Chiarelli and Halterman might be watched by police or FBI agents. There is nothing in the record to suggest, however, that a high speed escape was within Durish's contemplation when he agreed to assist Halterman and Chiarelli. We do not think, there-

fore, that Durish could reasonably foresee the significant danger to public safety posed by Halterman's actions. The district court erred in departing, in Durish's case, on the basis of the danger created by Halterman's and Chiarelli's escape.

In addition, the district court referred to Durish's connection to the bank burglars, organized crime, murders and arson. As discussed in Halterman's case, the guideline for receipt of stolen property adequately accounts for Durish's connection with the bank burglars. This is not a proper basis for departure. The other items mentioned by the district court—particularly murder and arson—appear on this record to be completely unconnected to Durish and based on evidence of at best doubtful reliability. *Cf. United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir.1982) (in preguidelines case, facts relied upon at sentencing must have some minimal indicia of reliability beyond mere allegation). These are not proper grounds for departure either.

### B.

Durish, like Chiarelli, also served honorably in the armed forces. He enlisted in the United States Marine Corps on July 27, 1960 and was honorably discharged as a corporal on January 26, 1965. Durish PSR at 18. Durish was a military policeman while in the Marine Corps and served two years as a guard at the old United States Naval prison at Portsmouth, New Hampshire. *Id.*

For the same reasons given in Chiarelli's case, the district court did not err by refusing to consider Durish's military service as a ground for departure.

### C.

Durish contends the district court erred by refusing to consider the recovery of the stolen property as a mitigating factor warranting departure. Durish argues the district court's refusal deprives him of his due process right to consideration of factors peculiar to him that are relevant in sentencing. *Pipich*, 688 F.Supp. at 193. As noted above, *United*

*States v. Frank*, 864 F.2d at 1009, forecloses the due process argument.

Beyond that, the district court properly applied the guidelines by refusing to consider the fact of recovery. To determine the value of the stolen property, or "loss," Application Note 3 of section 2B1.2 refers to the commentary to 2B1.1, which gives an illuminating example:

> [I]f a defendant is apprehended in the process of taking a vehicle, the loss refers to the value of the vehicle even if the vehicle is recovered immediately.

U.S.S.G. § 2B1.1 comment. (n. 2) (effective June 15, 1988). Similarly, the loss, and hence the value, of the stolen weapons is to be determined without regard to whether they were recovered.

### D.

Durish contends the district court erred in failing to give him appropriate credit for accepting responsibility for his role in the offense. In a letter to the court, dated June 2, 1989, Durish wrote, "I fully accept responsibility for my action in aiding the commission of the crime of which I was found guilty."

The district court, however, found the letter was not a truthful acceptance of responsibility since in it Durish disclaimed any knowledge of the purpose of the trip to Florida, although he acknowledged he knew he would be paid to travel there with Chiarelli. He also wrote that he had never seen the weapons, did not know who had them or where they came from. We do not find the district court's finding clearly erroneous or "without foundation." *See United States v. Ortiz*, 878 F.2d 125, 128 (3d Cir.1989); U.S.S.G. § 3E1.1 comment. (n. 5) (effective November 1, 1987).

### E.

Finally, Durish argues that the district court erred in failing to grant him a reduction of two offense levels for playing a minor or minimal role in the offense. *See* U.S.S.G. § 3B1.2 (effective November 1, 1987). The background to this guideline states, "This section provides a range of

adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 comment. (backg'd) (effective November 1, 1987).

The district court found that Durish "was right there in the middle of Tampa Center City ... moving guns from the van into the Buick." Chiarelli App. at 72. The record also shows that Durish drove with Chiarelli to Florida, picking up Jordan in Virginia, that he carried a briefcase containing radio scanners and walkie talkies and that he helped in executing various car maneuvers before driving into downtown Tampa to exchange weapons. The district court did not err in its findings of fact or its application of section 3B1.2. The record supports a conclusion that Durish is not substantially less culpable than Halterman, Chiarelli or Jordan.

### V.

Given the record before us, we see no reason for departing from the guideline range in Durish's case. We will therefore vacate his sentence and remand to the district court for resentencing within the guideline range.

In Halterman's and Chiarelli's cases, it appears more than likely the district court imposed sentence on the basis of improper factors, such as the magnitude of the theft and defendants' connection to sophisticated thieves. The risk of harm created by the high speed escape, however, would be a proper basis for departure in their cases. We will therefore vacate their sentences and remand to the district court for resentencing with instructions not to rely on improper factors in departing from the guidelines. We are confident that on resentencing the district court will refrain from taking into consideration factors that are adverse to the philosophy of guideline sentencing, which is now the law of the land, whether the district court philosophically agrees or disagrees with it.