**UNITED STATES of America**

v.

**Larry KOPP, Defendant.**

**Cr. No. 89–264 (GEB).**

United States District Court, D. New Jersey.

April 30, 1991.

Michael Chertoff, U.S. Atty., Newark, N.J. by Daniel J. Gibbons, Asst. U.S. Atty., for the U.S.

Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J. by James A. Plaisted, for defendant, Larry Kopp.

## OPINION AND ORDER

BROWN, District Judge.

### INTRODUCTION

Larry Kopp is before this Court for sentencing on his plea of guilty to two counts of a twelve count Indictment. Count 1 charges that from November 15, 1987 through January 31, 1988, in this District, Kopp conspired and agreed with Stuart Sherer to defraud the Ensign Bank FSB of up to $14 million and to obtain the money, funds, credits, assets and property of the Ensign Bank by means of false and fraudulent pretenses. The Indictment charges

that Kopp ordered codefendant Sherer to create false, fraudulent and forged leases and estoppel letters to attorneys for the bank. These false documents were used in support of the loan application for Ramsey Retail Associates, a real estate partnership of which Kopp was a partner, for the purpose of misrepresenting to Ensign Bank the amount of money being earned by the property and thereby inducing Ensign Bank to advance money which would not otherwise have been advanced. It was part of this conspiracy that the defendant caused the bank to advance $13.75 million to Ramsey Retail Associates in reliance upon the false, fraudulent and forged documents. Count 2 of the Indictment repeats the charges contained in Count 1 and additionally charges that Larry Kopp knowingly and willfully executed the scheme to defraud, in that he attended a meeting to close the loan sought from Ensign Bank and obtained the funds being advanced. Because Mr. Kopp's criminal conduct occurred after November 1, 1987, the Sentencing Reform Act of 1984 is applicable. The Sentencing Guidelines which were in effect at the time the offense occurred are being used as these guidelines are more advantageous to the defendant than the revised Guidelines which were promulgated on November 1, 1989. A three-day sentencing hearing was conducted with extensive testimony in order to resolve the parties' objections to the Presentence Report submitted by the Probation Office. The primary issue presently before the Court is how to appropriately determine the estimated, probable or intended loss [1] to Ensign Bank as a result of the defendant's conduct and what increase in the base offense level, if any, is warranted. The parties have also raised various other objections to the Presentence Report which are considered in the latter portion of this Opinion. The Court must additionally determine whether downward or upward departures are appropriate. The parties re-

sponded to the Presentence Report, the above hearings were held, and the parties were permitted extensive post-hearing submissions. The Court now considers these matters ready for decision.

BACKGROUND

A. *Background of the Kopp Businesses*

Larry Kopp and his brother Marvin Kopp operated a real estate development business comprising several corporations engaged in building construction, and various partnerships holding title to buildings developed by the brothers. In November 1984, Marvin Kopp died. Financial disputes arose between the defendant and his brother's widow, Judith Kopp, in which Judith accused the defendant of dissipating partnership assets for personal use. In June 1988, Kopp's nephew, David Kopp, approached the FBI and reported that his uncle and Stuart Sherer, a Kopp employee, were involved in several criminal schemes. He agreed to use a tape recorder to capture conversations with Sherer and Kopp. After being confronted with recordings of his conversations with David Kopp, Sherer agreed to cooperate and record additional conversations with Larry Kopp.[2]

B. *The Ensign Bank Fraud*

Between 1986 and 1987 Larry Kopp borrowed heavily, pledging various partnership properties as security and gradually dissipating the partnership assets. In August 1987, one of the real estate partnerships, Ramsey Retail Associates, began to negotiate with the Ensign Bank FSB for a $14 million mortgage on a shopping mall. This financing was necessary because Ramsey's prior lender was about to declare a default as a result of a second mortgage Kopp placed on the property without the permission of the first lender. In addition, Kopp sought to obtain a loan amount over and above the amount necessary to retire

---

1. The language "estimated, probable, or intended loss" was contained in U.S.S.G. § 2F1.1(b)(1) until June 15, 1988, at which time the section was amended by deleting "estimated probable, or intended" immediately before "loss".

2. Stuart Sherer is presently awaiting sentencing before the Honorable Clarkson S. Fisher on a plea of guilty to one count of Bank Fraud, in violation of 18 U.S.C. § 1344, (Crim No. 89–471).

the outstanding loans[3] representing developer's profit from the project. From November 1987 through January 1988, Kopp delivered forged documents to Ensign Bank in order to obtain the loan. In addition, Kopp signed two certified rent rolls, which attested to the truth of false rental income information submitted in support of the loan. The forged leases, forged estoppel letters and fraudulent rent rolls were intended to support Kopp's contention that the property was fully rented and earning sufficient rents to make the mortgage payments called for by the terms of the loan. The false documents submitted to the bank were necessary because parts of the shopping center were vacant, lessees had numerous complaints about the management of the building, and several prospective tenants had already informed Kopp that they intended to break their leases and refuse to accept occupancy.

Though the loan commitment was for $14 million, the defendant still could not show a sufficient debt service ratio to collect the entire amount of the loan. Therefore, the loan closed in two stages: in December 1987, for $13 million, and in January 1988, for an additional $750,000. Mr. Kopp explained that the funds from the $13 million loan closing in December were disbursed almost entirely to pay the construction loan and the second loan on the property as well as various other debts. He further explained that he intended to repay the loan and intended to continue to look for additional tenants besides those listed in the false rent roll.

Interest payments on the loan were delinquent beginning in February 1988 and the loan eventually went into default. Ensign Bank demanded a deed in lieu of foreclosure and was forced to operate the property beginning in April 1988 until its subsequent sale for $14.5 million.

## DISCUSSION

### A. *The Offense and Appropriate Guideline Range*

Defendant plead guilty to one count of conspiracy to commit bank fraud and one count charging a substantive offense of bank fraud in violation of 18 U.S.C. § 1344.[4] Under U.S.S.G. § 3D1.2(b)(1), the two counts are grouped together as one count charges conspiracy and the other count charges the substantive offense. The applicable guideline for an offense charged under 18 U.S.C. § 1344 is U.S.S.G. § 2F1.1 *Fraud and Deceit.* The Base Offense Level for this offense is 6. Section 2F1.1(b)(1) provides that the Court must increase a defendant's offense level based on the "estimated, probable or intended" amount of dollar loss exceeding $2,000 which resulted from the defendant's fraudulent scheme. U.S.S.G. § 2F1.1(b)(1).

### B. *The Varying Theories of Loss Calculation*

#### 1. The Presentence Report.

The probation officer completing the Presentence Report relied on the bank's reported out-of-pocket expenses to calculate loss. The officer explained that there was no indication that the defendant attempted to defraud the bank of the entire loan. In fact, the officer reported that the defendant expected to repay the entire amount of the loan. He concluded, therefore, that since he knew the exact amount of the loss as reported by the victim, he would use that figure for Guideline computation purposes. The bank reported that it had lost interest as a result of Kopp's delinquency and incurred various expenses in operating the property pending its eventual sale. In addition, the bank offered a below-market interest rate loan to the new purchaser in order to complete the sale and remove the

---

**3.** When the defendant applied to Ensign Bank there were approximately $12.3 million in preexisting liens on the property.

**4.** 18 U.S.C. § 1344 states:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

asset from the bank's books. The bank calculates the direct loss to the bank's earnings as a result of the Ramsey Retail Associates loan as follows:

Lost interest due to delinquency of loan: $1,478,125
Operating expenses to take over property: 364,200
Cost of low interest loan to new purchaser: 2,310,000
Minus sale price in excess of loan: (750,000)
$3,402,325

The probation officer calculated, therefore, that under section 2F1.1(b)(1) an additional ten-point increase was warranted because the estimated, probable or intended loss was between $2,000,001 and $5,000,-000. U.S.S.G. § 2F1.1(b)(1)(K).

### 2. The Defendant's Theory of Loss.

Defendant contends that if the bank suffered any loss at all, it is as a result of the conduct of others. Kopp further contends that in any event, the loss to the bank is de minimis because the defendant's collateral property was eventually sold by the bank for more than the original loan. Defendant both challenges the loss figures supplied by the bank as inaccurate and also attributes whatever loss there might be to his nephew and codefendant Sherer. To demonstrate that the value of the collateral was greater than the amount of the loan, defendant presented the testimony of a real estate appraiser who testified that the value of the property as of the date of the deed in lieu of foreclosure was at least $17.5 million. Kopp further argues that the bank's reported loss figures are overstated because they fail to take into consideration collected yet unaccounted rent income from the time the bank took control of the property. Kopp believes, therefore, that since both he and Sherer intended to repay the loan from planned liquidations of the partnerships and from increased rent rolls, and because there was substantial

collateral in the property which resulted in a profit to the bank upon its sale, this case is different from a theft situation in which the intended loss is the full value of the theft. Accordingly, the defendant believes that no further increase in base offense level is warranted because there was no provable bank loss.

### 3. The Government's Theory of Loss.

The United States argues that Kopp should be charged with a loss amounting to the full amount of the money advanced by the bank, $13.75 million. Although the Government does not believe that the amount of the loan automatically becomes the amount of the loss or that the defendant should be treated exactly as a bank robber who obtains a similar amount of money from theft, it nevertheless believes that an analysis of defendant's conduct warrants an increase in the base offense level reflecting a loss of $13.75 million. The Government's argument is based on the claim that Kopp's false statements to the bank caused the bank to enter into a loan it would not otherwise have entered, and therefore, Kopp gained the full $13.75 million as a result of his fraudulent conduct.

Specifically, the Government contends the following:

1) Had the bank known the true income from the property, it would have lent only $10.2 million; [5]

2) The mathematical difference between the loan the bank's debt service ratio would have permitted had the defendant told the truth and what the bank advanced, approximately $3.5 million, understates the seriousness of the defendant's conduct because the bank's decision would have been to lend no money at all;

3) In support of this theory the Government presented the testimony of a bank officer who stated that because there were

---

**5.** Testimony of Kevin P. Maloney, Vice–President of Commercial Real Estate at Ensign Bank revealed that the bank's internal lending practice of requiring a debt service ratio of 1 to 1.2, would have resulted in the bank advancing approximately $10.2 million. Hearing Transcript, November 2, 1990, at 116; Maloney Dep. at 60; Letter from Kevin P. Maloney to AUSA Dan Gibbons, January 30, 1990 (attached as Exhibit 8 to Affidavit of Gerard Ingrisano, September 20, 1990).

preexisting liens on the property, well in excess of the $10.2 million the bank would have lent, the loan would not have closed. The bank officer stated that as long as a prior lender with a priority interest in the collateral could have caused a foreclosure on the property the bank would have refused to lend. Hearing Transcript, November 2, 1990, at 116; Maloney Dep., at 60–61.[6]

4) The Government also argues that the bank would not have lent money without estoppel letters, and all of the estoppel letters submitted by the defendant happened to have been forged. In addition, had the bank learned of the vacancies, the problems with construction and maintenance, and all of the other problems, it would not have accepted the property as collateral.

The Government strongly opposes the defendant's theory that no loss occurred or that the bank's recovery of collateral has any effect on the increase in base offense level. The Court's loss calculation addresses each of these concerns.

### C. *The Court's Loss Calculation*

■ The probation officer who prepared the Presentence Report consulted the Sentencing Commission with respect to the issue of "loss." Based on the Sentencing Commission's remarks, the probation officer believed that it is up to the Court to determine the amount of loss on a case-by-case basis. After considering the arguments raised by both sides as well as the theory submitted by the probation officer, this Court concludes instead that defendant Kopp should be charged with the full value of the loan obtained from Ensign Bank. The Court's decision rests on the three principles outlined below: (1) the computation of "loss" by interpreting the language of the Guidelines and the supporting Commentary and Background information; (2) the legal precedent governing recovery by the victim; (3) the focus on the conduct and culpability of the defendant and the Sentencing Commission's goal of achieving uniformity and proportionality in sentencing.

### 1. "Loss" Under the Guidelines and Supporting Commentary.

When determining "loss" under the Guidelines, courts are advised that the amount of loss need not be precise. A court "need only make a reasonable estimate of the range of loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.8).[7] The Commentary to section 2F1.1 informs courts that the valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). U.S.S.G. § 2F1.1, comment. (n.7).[8] That section states the following:

> U.S.C. § 3472. Second, the commentary may suggest circumstances which, in the view of the Commission, may warrant departure from the guidelines. Such commentary is to be treated as the legal equivalent of a policy statement. Finally, the commentary may provide background information, including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline. As with a policy statement, such commentary may provide guidance in assessing the reasonableness of any departure from the guidelines.
> U.S.S.G. § 1B1.7.
> The commentary to that section advises courts to treat the commentary much like legislative history or other legal material that helps determine the intent of a drafter. U.S.S.G. § 1B1.7, comment.

**6.** When asked whether the bank would have lent the $10.2 million on a property that already had in excess of $12 million in mortgages against it Kevin Maloney replied: "It would have made it pretty much impossible for it to close, because Mr. Kopp would have had to come out of pocket with a difference between the 12 million and change and our funding in order to close. It would require substantial future equity on his part." Maloney Dep., at 61; *see also* Hearing Transcript, November 2, 1990, at 116.

**7.** U.S.S.G. § 1B1.7 addresses the significance of Commentary under the Guidelines. That section states:

> The Commentary that accompanies the guideline sections may serve a number of purposes. First it may interpret the guideline or explain how it is to be applied. Failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal. *See* 18

**8.** In the Sentencing Guidelines in effect in October 1987, Application note 7 of the Commentary to section 2F1.1 did not contain a cross refer-

"Loss" means the value of the property taken, damaged or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.

U.S.S.G. § 2B1.1, comment. (n.2). The Background to that section explains that "[t]he value of the property taken plays an important role in determining sentences for theft offenses, because it is an indicator of both the harm to the victim and the gain to the defendant." U.S.S.G. § 2B1.1, comment. (backg'd). The Guidelines also state that "[t]he offender's gross gain from committing the fraud is an alternative estimate [of] loss." U.S.S.G. § 2F1.1, comment. (n.8).

We must conclude that "the value of property taken" as a result of the defendant's false statements to the bank was the full amount of the loan. This is the fair market value of the property taken since, as the evidence has shown, the bank would not have entered into the loan at all if they had known the truth regarding this transaction. Defendant's argument that substantial collateral was given in exchange for the loan does not alter the Court's belief that the full amount of the loan is consistent with the intent of the Guidelines's drafters. In order for the Court to consider the exchange of collateral as affecting the victim's loss calculation, we would necessarily have to determine how much the victim ultimately recouped from his or her loss. As is discussed more fully below, this would be an inappropriate exercise.

The possible loss the bank could have suffered, or in other words, the amount defendant put at risk, is the appropriate measure of loss in this case. The focus for sentencing purposes, therefore, should be on the amount of loss that defendant was attempting to inflict on the bank. The Guidelines provide that "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." U.S.S.G. § 2F1.1, comment. (n.7).[9] Kopp clearly intended to obtain, through the use of a fraudulent scheme, the full amount of the $13.75 million loan. Kopp's statements to the contrary, that he intended to repay the loan from planned liquidations of the partnerships and from increased rent rolls, do not alter the fact that he clearly harmed the bank by defrauding it out of $13.75 million it would not have otherwise lent.

Crediting defendant with the full amount of the loan is also consistent with the Guidelines's alternate estimate of loss by using the gain to the defendant. *See* U.S.S.G. § 2F1.1, comment. (n.8), § 2B1.1, comment. (backg'd). Kopp's realized gain as a result of his false statements to the bank was the full amount of money advanced by the bank, $13.75 million. The funds received were used to retire the outstanding loans on the property and to fund partnership distributions, in the form of developer's profit from the project.[10] Thus, Kopp obtained $13.75 million he would not have otherwise received but for the fraud committed upon Ensign Bank.

The Commission's policy on attempt crimes also convinces the Court that Kopp must be charged with the full value of the

---

ence to section 2B1.1 of the guidelines. This cross reference became effective June 15, 1988.

**9.** Even assuming, arguendo, that the out-of-pocket expenses claimed by the bank would constitute the "actual loss", application note 7 of the Commentary indicates that the probable or intended loss should be used if it is larger than the actual loss.

**10.** Defense counsel has argued that Kopp was obtaining a loan from the Ensign Bank to refi-

nance existing obligations and to gain sufficient funds to continue the operation of the various partnerships. Sentencing Memorandum of Larry Kopp, at 14; Annotated Reply Brief of Defendant Larry Kopp, at 4.

In addition, the testimony of David Kopp confirmed that payments were regularly made to the partners out of the financing received from Ensign Bank. Hearing Transcript, October 25, 1990, at 168.

loan he obtained as a result of his fraudulent scheme. The Guidelines state:

> In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the "loss" would be treated as $40,000 for purposes of this guideline.

U.S.S.G. § 2F1.1, comment. (n.7). Had Kopp's fraudulent scheme been discovered prior to obtaining the funds from the bank, it is fair to assume that he could have been charged with attempting to obtain $13.75 million from Ensign Bank. His "representation" that the rent rolls and estoppel letters were genuine would result in a loss computation of $13.75 million, the amount of the loan, by applying the reasoning of this Commentary. It would therefore be inappropriate to credit Kopp with less of a loss after having completed his crime than it would had he been apprehended prior to its completion.[11]

The inference raised by Application note 11 of the Commentary, dealing with the appropriateness of a downward departure, further supports the Court's belief that the loss in this case is the full amount of the loan. That section states in part:

> In a few instances, the total dollar loss that results from the offense may overstate its seriousness. Such situations typically occur when a misrepresentation is of limited materiality or is not the sole cause of the loss. Examples would include understating debts to a limited degree in order to obtain a substantial loan which the defendant genuinely expected to repay.... In such instances, a downward departure may be warranted.

U.S.S.G. § 2F1.1, comment. (n.11).

We must interpret that section as suggesting that there may be instances where the defendant's conduct is minor in comparison to the amount of the loss he or she is credited with having caused. The inference raised by that section is that a departure down from the total dollar loss caused by the "substantial loan" would be appropriate when the defendant's conduct (understating debts to a limited degree) and culpability (a loan which defendant genuinely expected to repay) are minor (i.e., the total dollar loss that results from the offense overstates its seriousness). It appears that the drafters of the Guidelines clearly envisioned the hypothetical defendant in their example to be charged with a loss amounting to the full amount of the loan.

Based on the analysis of the language contained in the Guidelines and supporting Commentary, the Court concludes that the loss attributed to Kopp for sentencing purposes must be the full $13.75 million he obtained from the bank as a result of his fraudulent scheme. This result is warranted in light of the evidence showing that the bank would not have entered into such a transaction but for the defendant's false statements. Charging Kopp with the full amount of the loan is also appropriate since it is clear that he obtained the full benefit of the $13.75 million loan.

## 2. The Legal Precedent Regarding Subsequent Recovery by the Victim.

The defendant has pursued exhaustive arguments trying to convince the Court that it must engage in a complex calculation of set-offs and credits in order to determine the precise amount of loss actually caused Ensign Bank. The defendant argues that had he required the bank to go through a foreclosure proceeding rather than settling the case without the need for litigation, he would have been entitled to an accounting to receive the excess value of the property.[12] Kopp also challenges the

---

**11.** This conclusion is based on the Court's belief that Kopp willfully and intentionally executed a scheme to defraud Ensign Bank out of $13.75 million, notwithstanding the defendant's claims that he genuinely expected to repay the loan.

**12.** This theory must be rejected, for any civil accounting that defendant might have been entitled to under a foreclosure action does not affect this Court's determination of loss for sentencing purposes.

bank's reported loss figures as unreliable. He claims, *inter alia,* that tenants of the shopping center had in fact paid rent for the months of June and July which were not considered in the bank's loss accounting and that certain capital and legal expenses were incurred after the bank sold the property to the eventual buyer and should not be included as part of the loss credited Larry Kopp.

We must again note that the Court need not determine the precise amount of the loss. Application note 8 to section 2F1.1 states:

> The court is not expected to identify each victim and the loss suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information.

Accordingly, it is unnecessary for the Court to analyze the claimed discrepancies in the bank's computation of its loss in light of the Court's holding that Kopp should be credited with the full amount of the loan for sentencing purposes. The Court is additionally prohibited from considering any recovery the bank made by either taking a deed in lieu of foreclosure or through its operation of the property for this consideration would be inconsistent with the intent of the Guidelines as well as the applicable legal precedent.

In *United States v. Chiarelli,* 898 F.2d 373 (3d Cir.1990), our Third Circuit Court of Appeals held that loss is to be determined without regard to whether the stolen property[13] was eventually recovered and as such, the sentencing court did not err by refusing to consider the fact that the victim eventually recovered the stolen property. The court referred to Application note 2 of section 2B1.1 which states: "if a defendant is apprehended in the process of taking a vehicle, the loss refers to the value of the vehicle even if the vehicle is recovered immediately." *Id.* at 384 (citing U.S.G.G. § 2B1.1, comment. (n.2)).

Likewise in *United States v. Johnson,* 908 F.2d 396 (8th Cir.1990), a case with a legal issue particularly analogous to the one presented here, the Court of Appeals for the Eighth Circuit held that the focus for sentencing purposes should be on the amount of the possible loss which the defendant attempted to inflict on the banks irrespective of the fact that the banks were secured creditors and had recovered some of their "losses." *Id.* at 398. The defendant in that case claimed that the sentencing court erred because it based its offense level computation on the total amount of credit that had been extended to her. She asserted that since the banks were secured creditors and since both of the financed cars at issue had been repossessed, the banks lost far less than the amount the district court used for sentencing purposes. The court of appeals rejected the defendant's contention holding:

> Although the banks were able to recoup a substantial portion of their loans, we agree with the district court that a defendant's offense level should not turn on whether or not the banks recovered some of their potential loan losses. Rather, the focus for sentencing purposes should be on the amount of the possible loss which Johnson attempted to inflict.

*Id.*

In *United States v. Westmoreland,* 911 F.2d 398 (10th Cir.1990), the Court of Appeals for the Tenth Circuit considered whether "loss" for the purposes of U.S. S.G. § 2B1.1(b)(1) should be determined solely by the value of the items taken in a theft, or whether that figure should be reduced by the value of the items ultimately recovered by the victim. *Id.* at 399. Holding that "loss" for the purposes of sentencing should not be reduced by the value of items ultimately recovered by the victim, the court said "[t]he fact that good police work diminished the actual loss to the ... victim should not affect the determination of the extent of the defendant's

---

**13.** Defendant has repeatedly tried to distinguish his conviction for bank fraud from one for theft. Since the Commentary to Section 2F1.1, however, advises courts that the valuation of loss is discussed in the Commentary to Section 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft), the following cases that interpret the valuation of loss under Section 2B1.1 are equally applicable by analogy to the valuation of loss under section 2F1.1.

culpability and responsibility for the purposes of sentencing." *Id. See also United States v. Cockerham,* 919 F.2d 286, 289 (5th Cir.1990) (holding that even though the bank loans at issue were repaid, "loss" includes the value of all property taken, even that recovered or returned).

In light of the preceding precedent, we believe that the evidence submitted by defendant on how much money the bank actually recovered or could or should have recovered is irrelevant for the purpose of determining the amount of loss to be credited the defendant. Accordingly, the $13.75 million loss we are crediting Kopp will not be reduced by any recovery the bank may have made.

3. The Focus on the Conduct and Culpability of the Defendant and the Sentencing Commission's Goal of Achieving Uniformity and Proportionality in Sentencing.

Section 1B1.3 of the Guidelines, *Relevant Conduct (Factors that Determine the Guideline Range),* addresses the conduct relevant to a determination of the applicable guideline range. This section notes that the base offense level and specific offense characteristics shall be determined on the basis of:

(3) all harm or risk of harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above, if the harm or risk was caused intentionally, recklessly or by criminal negligence, and all harm or risk that was the object of such acts or omissions;

U.S.S.G. § 1B1.3. "Harm" is defined as including "bodily injury, monetary loss, property damage and any resulting harm." U.S.S.G. § 1B1.3, comment. (n.3). To arrive at the correct guideline range, therefore, it is appropriate that we analyze the full scope of defendant Kopp's conduct. By submitting fraudulent documents to Ensign Bank in order to obtain financing, Kopp sought to harm the bank or sought to put the bank at risk for the full amount of $13.75 million loan. Accordingly, Kopp's offense level should be increased to reflect the full scope of his conduct and culpability.

While the Government recognizes that charging Kopp with the full amount of the loan would only raise his guideline offense level by one level under section 2F1.-1(b)(1)(L) (Over $5,000,000),[14] and would result in an overlapping sentencing range, it urges the Court to consider the Guidelines's desire to achieve uniformity and proportionality in sentencing. Arguing that defendant has invited the Court to engage in extended hearings and calculations every time a financial fraud conviction occurs, the Government asserts that "such a calculation is contrary to the intent of the Guidelines to give clear, easily applied rules for sentencing defendants in a manner that results in similarly situated defendants receiving similar sentences." Government's Memorandum in Response to Defendant's Annotated Sentencing Brief, at 2. We must agree.

The length and complexity of the three days of hearings and numerous post-hearing submissions by the parties convinces the Court that to engage in such a calculation would be contrary to the uniformity and proportionality in sentencing sought by the Guidelines. Congress sought to achieve three objectives in enacting the new sentencing law: honesty in sentencing, uniformity and proportionality. U.S.S.G., Part A—Introduction, p.s. 3. By uniformity, Congress sought to narrow the disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders. By proportionality, Congress sought a system of sentencing that imposes appropriately different sentences for conduct of different severity. *Id.* By balancing these interests, the Sentencing Commission sought to eliminate the disparity and uncertainty that existed in the prior

---

**14.** As noted earlier, the Sentencing Guidelines that were in effect at the time the offense occurred are being used as these guidelines are more advantageous to defendant Kopp than the revised Guidelines which were promulgated November 1, 1989. Under the Guidelines now in effect, a loss of $13.75 million would result in a fifteen-point increase in the base offense level. *See* U.S.S.G. § 2F1.1(b)(1)(P) (effective November 1, 1989).

system of sentencing. To engage in the type of complex, subjective and problematic analysis sought by the defendant in this case, which would be based in part on the subsequent conduct of the victim, not only appears unworkable, but destructive to the objective of eliminating the uncertainty and disparity in sentencing.

Kopp sought to defraud the Ensign Bank of $13.75 million. He will not receive credit for any recovery made by the victim after the commission of his crime, nor will he be charged with less of a loss because he claims the bank was given substantial collateral in exchange for the loan. The Guidelines expect that defendants will be credited with the full object of their actions and address the appropriate instances for departure when the defendant's conduct and culpability are minor in comparison to the loss he or she is being credited with. *See* U.S.S.G. § 2F1.1, comment. (n.11) and discussion *supra*, section C.1. Accordingly, the Court is permitted to depart from a guideline-specific sentence when the facts of a particular case warrant, however, only when it finds "an aggravating or mitigating circumstance ... not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).

### D. *The Offense Level Computation*

Under the principles outlined in the preceding Opinion, Kopp's offense level should be calculated based on both the intended loss to the bank as well as the gain he personally received. In this case, the appropriate calculation results in a $13.75 million loss. Larry Kopp will receive an eleven-point increase in the Base Offense Level. U.S.S.G. § 2F1.1(b)(1)(L).

### E. *Other Defense Objections to the Presentence Report*

The defense raises several other objections which may be resolved far more briefly:

■ 1) The Report at ¶ 38 would not give defendant a two-point downward adjustment for acceptance of responsibility "un-

less the court is otherwise convinced." While this Court does not credit defendant's attempt to shift blame from himself to others and to minimize his role in the offense, it nonetheless feels that there has been a sufficient acceptance of responsibility to make the two-point downward adjustment.

2) The Report at ¶ 33a gives Kopp a two-point upward adjustment for more than minimal planning and at ¶ 34 a further two-point upward adjustment for his role in the offense as Manager and Supervisor. These conclusions are amply supported by the Report and testimony presented and will be adopted.

3) Page 19 of the Addendum to the Report refers to defendant's objections entitled "Additional Factual Error and Unfairly Prejudicial But Irrelevant Material in the Report", which objections do not affect the guidelines computation. This Court does not find the Report to be unfair and accepts the explanation and conclusion of the Probation Office.

### F. *The Appropriateness of Upward or Downward Departures*

The Government has argued that an upward departure is warranted under U.S.S.G. § 2F1.1, Application note 10. That section, as applicable to this offense,[15] stated that the adjustments for loss did not distinguish frauds involving losses greater than $5 million and that an upward departure might be warranted if the loss substantially exceeds that amount. On the other hand, under U.S.S.G. § 2F1.1, Application note 11, the Court might depart downward if it feels that the total dollar loss that results from the offense overstates its seriousness. After considering the facts and circumstances of this case, and the arguments of counsel, the Court believes that the eleven-point increase in the defendant's base offense level adequately represents the seriousness of the defendant's crime.

■ Defendant seeks a further downward departure arguing, *inter alia*, that he

---

**15.** *See supra* note 14.

has been "punished significantly already" by loss of assets and livelihood. The Court does not feel that this argument provides an appropriate basis for a downward departure.

### G. *The Final Guideline Calculation*

Except as noted above, the Presentence Report is adopted by the Court. Therefore, the *Offense Level Computation* is as follows:

| | |
|---|---|
| Base Offense Level: | 6 |

| | |
|---|---|
| Specific Offense Characteristics: | |
|   Loss over $5,000,000: | +11 |
|   More than minimal planning: | +2 |
| Adjustment for Role in the Offense: | +2 |
| Victim Related Adjustment: | 0 |
| Obstruction of Justice: | 0 |

| | |
|---|---|
| Adjusted Offense Level (Subtotal): | 21 |

| | |
|---|---|
| Acceptance of Responsibility: | −2 |
| Total Offense Level: | 19 |

With a Criminal History Category of I, the Guideline imprisonment range is 30–37 months, and the Guideline supervised release range is 2–3 years.

As to a Guideline fine range and amount of restitution, the Probation Office reviewed defendant's ability to pay in some detail at paragraphs 64 through 69 of the Report and concluded that "Mr. Kopp is found to be without any assets and incapable of paying any fine or restitution that the Court may wish to impose." The Government has not disputed this conclusion.

As noted above, we have found no factor which would warrant additional departures either upward or downward.

Pursuant to the foregoing Opinion,

It is this 30th day of April, 1991,

ORDERED that the defendant shall appear before the Court for Final Sentencing on May 17, 1991 at 1:00 p.m.