**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                      No. 96-4919

NARKEY KEVAL TERRY,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-96-207-A)

Argued: October 29, 1997

Decided: April 22, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and BULLOCK,
Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Williams wrote
the opinion, in which Judge Luttig and Chief Judge Bullock joined.

_____

**COUNSEL**

**ARGUED:** David Benjamin Smith, ENGLISH & SMITH, Alexan-
dria, Virginia, for Appellant. Randy I. Bellows, Assistant United
States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:**
Helen F. Fahey, United States Attorney, Alexandria, Virginia, for
Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Narkey Terry was convicted in the United States District Court for the Eastern District of Virginia of two counts of involuntary manslaughter and one count of reckless driving. Although the Sentencing Guidelines called for a sentencing range of 21 to 27 months for Terry's crimes, the district court sentenced Terry to 120 months imprisonment. The district court, relying upon three separate encouraged factors, departed upward a total of fifteen levels. Terry now appeals the district court's upward departure. Finding that the district court erred in several respects, we vacate the sentence imposed and remand for resentencing.

I.

In the early morning of April 17, 1996, Terry was driving his Jeep Cherokee northward along the George Washington Memorial Parkway (G.W. Parkway).[1] Near the Ronald Reagan National Airport exit, Terry pulled in behind a Chevrolet Beretta driven by Billy Canipe. According to the testimony of several eyewitnesses, Canipe was driving about 20 miles per hour in the left (passing) lane. Seemingly upset with Canipe's slow pace, Terry began tailgating him. After two or three minutes, the low-speed tailgating escalated to a high-speed chase. Over the course of approximately eight miles, witnesses saw the two drivers race each other at speeds of up to 80 miles per hour.[2]

_____

[1] The G.W. Parkway "stretches from Mount Vernon at its southern end through the city of Alexandria, north through Arlington and Fairfax Counties, past Memorial and Key Bridges, to its northern end at the intersection of the Capital Beltway." Udall v. Washington, Virginia & Maryland Coach Co., 398 F.2d 765, 766 (D.C. Cir. 1968). Of particular importance in this case, the G.W. Parkway is a federal highway under the jurisdiction of the United States and the direction of the National Park Service. See id. at 766-67.

[2] The posted speed limit over that stretch of the G.W. Parkway varied from 40 to 50 miles per hour. Near Roosevelt Island, however, construction further limited the speed limit to 30 miles per hour.

2

Eventually, Terry's Jeep hit Canipe's Beretta, causing the Beretta to spin across the median and into the southbound lanes, where it struck a Ford Taurus driven by George Smyth. The impact killed Mr. Smyth instantly. A section of Canipe's car, weighing close to 500 pounds, flew into the air and landed on the windshield of a Dodge Caravan driven by Nancy McBrien. Mrs. McBrien died within moments of the crash. Canipe was thrown from his car and sustained fatal injuries. Terry sustained a broken ankle and cuts and bruises to his face and chest.

The United States charged Terry with two counts of involuntary manslaughter (Nancy McBrien and George Smyth) in violation of 18 U.S.C.A. § 1112 (West 1984 & Supp. 1997); with one count of reckless driving in violation of 18 U.S.C.A. § 13 (West Supp. 1997) and Va. Code Ann. § 46.2-852 (Michie 1996); and with one count of carrying a concealed weapon in violation of 18 U.S.C.A.§ 13 and Va. Code Ann. § 18.2-308 (Michie Supp. 1997). Terry pleaded guilty to carrying a concealed weapon. Following a two-day jury trial, Terry was convicted on the remaining three counts.

Terry was sentenced pursuant to the involuntary manslaughter guideline. See U.S. Sentencing Guidelines Manual § 2A1.4 (1995). Due to his reckless driving, Terry's base offense level was set at fourteen. See U.S.S.G. § 2A1.4(a)(2). Because Terry was convicted on two counts of involuntary manslaughter, his base offense level was increased an additional two levels pursuant to the Guidelines' grouping rules. See U.S.S.G. § 3D1.4. With an adjusted offense level of 16 and a criminal history category of I, Terry's guideline range was 21-27 months. See U.S.S.G. Ch.5, Pt.A.

Believing that 33 months[3] would be "a wholly inadequate sentence given the severity of the defendant's conduct," (J.A. at 125), the district court determined that an upward departure was warranted. First,

_____

[3] The district court mistakenly stated that the guideline range for a defendant with an adjusted offense level of 16 and a criminal history category of I was 27-33 months. Because the applicable guideline range is "relevant in assessing the reasonableness of the departure," United States v. Talbot, 902 F.2d 1129, 1134 (4th Cir. 1990), we note that the correct guideline range was, in fact, 21-27 months.

the district court departed upward eight levels to reflect the danger to the public created by Terry's reckless driving. See U.S.S.G. § 5K2.14, p.s. Next, the district court departed upward four levels to account for the additional death of Canipe. See U.S.S.G.§ 5K2.1, p.s. Finally, the district court departed upward three levels to take into consideration the extreme psychological impact to the family members of the victims. See U.S.S.G. § 5K2.3, p.s. In total, the district court departed upward fifteen levels. With a total offense level of 31 and a criminal history category of I, Terry's guideline range was 108-135 months. See U.S.S.G. Ch.5, Pt.A. Terry was sentenced to 120 months imprisonment on the two involuntary manslaughter counts, a concurrent term of 12 months on the reckless driving charge, and a consecutive 6 month term of imprisonment on the concealed weapon charge. On appeal, Terry argues only that the district court abused its discretion in departing upward by fifteen levels.

II.

It is well established that a sentencing court may depart from the applicable guideline range where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C.A. § 3553(b) (West Supp. 1997). In determining "whether a potential basis for departure was adequately considered by the [Sentencing] Commission . . ., a sentencing court must focus on whether the factor is taken into account by the guidelines, policy statements, or commentary." United States v. Barber, 119 F.3d 276, 280 (4th Cir.) (en banc), cert. denied, 118 S. Ct. 457 (1997); see also United States v. Brock, 108 F.3d 31, 33 (4th Cir. 1997). For example, if a factor has been forbidden by the Sentencing Commission, "the sentencing court cannot use it as a basis for departure." Koon v. United States, 116 S. Ct. 2035, 2045 (1996); see also Barber, 119 F.3d at 280 (noting that "a departure premised upon [a forbidden] factor is never permissible"). In contrast, if a factor is one upon which the Sentencing Commission encourages departure, and that factor is not taken into account by the applicable guideline, a court may exercise its discretion and depart on that basis. See Koon, 116 S. Ct. at 2045. However, if an encouraged factor is already taken into account in the applicable guideline, or if a factor is discouraged, the sentencing court may depart "only if the factor is present to an exceptional degree or in

4

some other way makes the case different from the ordinary case where the factor is present." Id. Finally, "[i]f a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland." Id. (internal citation and quotation marks omitted).

Here, the district court relied upon three separate encouraged factors in departing upward a total of fifteen levels. We review each departure in turn, keeping in mind that a district court's decision to depart is reviewed for abuse of discretion. See Koon, 116 S. Ct. at 2043 ("[A]ppellate court[s] should not review the departure decision de novo, but instead should ask whether the sentencing court abused its discretion."); see also Barber, 119 F.3d at 283 (noting that the Supreme Court "made clear that it intended to adopt a traditional abuse of discretion standard").

A.

The district court departed upward eight levels"finding that the public's welfare and safety were significantly endangered during the protracted reckless driving of defendant." (J.A. at 126.) Danger to the public's safety is a factor upon which the Sentencing Commission has encouraged departure. In particular, § 5K2.14, p.s. provides:

> If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

U.S.S.G. § 5K2.14, p.s. Because endangering the public safety is an encouraged basis for departure, we must determine whether the conduct that created the danger is taken into account by the involuntary manslaughter guideline. See Barber, 119 F.3d at 285 (noting that encouraged factors normally may not be relied upon if already taken into account by the applicable guideline).

According to the district court, the public welfare was endangered

5

by Terry's protracted reckless driving. Our review of § 2A1.4 indicates, however, that Terry's reckless driving was already taken into account by the involuntary manslaughter guideline. Specifically, the base offense level for Terry's involuntary manslaughter convictions was increased from ten to fourteen due to his reckless driving. See U.S.S.G. § 2A1.4(a)(2). It is clear, therefore, that the danger to the public created by Terry's reckless driving was taken into account in the guideline that he was sentenced under. As a result, departure based upon reckless driving pursuant to § 5K2.14, p.s. generally would not be appropriate.**4** See U.S.S.G. § 5K2.0, p.s. (noting that where the applicable offense guideline takes into consideration an encouraged factor, departure from the applicable guideline range is generally not warranted).

Nevertheless, an upward departure would be permitted if Terry's reckless driving was "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon, 116 S. Ct. at 2045. This may be just such a case. Terry engaged in a road duel on a scenic parkway not designed for high-speed driving. The high-speed duel was variously described by eyewitnesses as a game of "cat-and-mouse,""tag," and "chicken." We doubt that such conduct is typical of reckless driving cases. The district court, however, did not recognize that§ 2A1.4(a)(2) accounted for Terry's reckless driving. See Barber, 119 F.3d at 282. As a result, the district court did not specifically find that Terry's

_____

**4** As support, the Government cites several cases, one of which is not even good law, for the proposition that a defendant's reckless driving justifies an upward departure under § 5K2.14, p.s. See United States v. Perez-Magana, 929 F.2d 518 (9th Cir.), withdrawn, 942 F.2d 1486 (9th Cir. 1991); United States v. Chiarelli, 898 F.2d 373 (3d Cir. 1990). We do not dispute that reckless driving endangers the public safety. Nor do we dispute that endangering the public safety is an encouraged basis for departure. The question here, however, is whether Terry's reckless driving was already taken into account by the guideline pursuant to which Terry was sentenced. See Barber, 119 F.3d at 285. Unlike § 2L1.1, see Perez-Magana, 929 F.2d at 518 (defendant sentenced under § 2L1.1 for transporting illegal aliens), or § 2B1.1, see Chiarelli, 898 F.2d at 373 (defendant sentenced under § 2B1.1 for receiving stolen property), § 2A1.4 takes into account a defendant's reckless driving. Thus, Perez-Magana and Chiarelli are plainly inapposite to the instant facts.

6

reckless driving was so extraordinary that it was outside the "heart-land" of situations encompassed by the applicable guideline. Under these circumstances, it is appropriate to remand so that the district court may determine in the first instance whether the danger created by Terry's reckless conduct was outside the "heartland" of the typical involuntary manslaughter case involving reckless driving. See United States v. Blake, 81 F.3d 498, 505 (4th Cir. 1996) (noting that the "failure to make the required findings necessitates remand").

If, on remand, the district court determines that an upward departure is warranted, it must also determine the extent of its departure. Although the Sentencing Commission has not provided the district courts with any specific guidance for determining the extent of a departure, the Sentencing Reform Act requires that any departure be reasonable under the circumstances. See 18 U.S.C.A. § 3742(f)(2) (West Supp. 1997). In determining what is reasonable under the circumstances, the sentencing court should first consider the rationale and methodology of the Sentencing Guidelines. See, e.g., United States v. Ferra, 900 F.2d 1057, 1061-62 (7th Cir. 1990) (observing that "[a] judge may not say: `I have decided to depart, so I now throw away the guidelines'"). In particular, it is often helpful to look to the treatment of analogous conduct in other sections of the Sentencing Guidelines.[5] See, e.g.,United States v. Gary, 18 F.3d 1123, 1131 (4th Cir. 1994) (holding that "[a]nalogies to similar offenses or aggravating circumstances . . . prov[ide] the best method for a principled

_____

[5] For example, "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer" warrants a two-level increase. See U.S.S.G. § 3C1.2. Although § 3C1.2 applies only where a defendant endangers the public while fleeing from the police, it may provide a useful guide for determining the extent of a departure in a case such as this. See, e.g., United States v. Gonzalez, 71 F.3d 819, 837 (11th Cir 1996) (applying adjustment where defendant "operated his vehicle, in reverse, at a high rate of speed on a residential street"); United States v. Woody, 55 F.3d 1257, 1274 (7th Cir. 1995) (applying adjustment where defendant led police on high speed chase); United States v. Luna, 21 F.3d 874, 885 (9th Cir. 1994) (applying adjustment where defendant drove through neighborhood at a high rate of speed); United States v. Mills, 1 F.3d 414, 423 (6th Cir. 1993) (applying adjustment where defendant drives at speeds up to 100 miles per hour on narrow road).

determination of departures"); United States v. Melton, 970 F.2d 1328, 1334 (4th Cir. 1992) (noting that analogous guideline provisions provide the best method for determining the extent of departures); United States v. Jackson, 921 F.2d 985, 991 (10th Cir. 1990) (stating that a sentencing court should draw analogies from other provisions in the guidelines when determining the extent of a departure); United States v. Kikumura, 918 F.2d 1084, 1112 (3d Cir. 1990) (stating that "analogy to the guidelines is . . . a useful and appropriate tool for determining" the extent of departures); United States v. Kim, 896 F.2d 678, 684 (2d Cir. 1990) (noting that "the structure of the Guidelines offers some guidance as to the normal extent of the departure"). In the event the Sentencing Guidelines do not provide any useful analogies, however, the sentencing "court must set forth some form of principled justification for its departure determination."[6] Gary, 18 F.3d at 1131 (noting that the sentencing "court may find it useful to analogize to similar case law").

B.

Although the deaths of Mr. Smyth and Mrs. McBrien were taken into account in the applicable manslaughter guideline, see U.S.S.G. § 2A1.4(a)(2), the district court determined that a four-level upward departure under § 5K2.1, p.s. was appropriate in light of "the additional death of Billy Canipe," (J.A. at 126). This factor is also one upon which the Sentencing Commission has encouraged departure. Section 5K2.1, p.s. provides: "If death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1, p.s. Terry argues that Canipe's death does not warrant a

_____

[6] In this case, the district court's decision to depart upward by eight levels under § 5K2.14 was based entirely on the following:

> Over an 8-mile stretch of the George Washington Memorial Parkway, a scenic roadway not constructed for high speed driving, defendant drove at speeds exceeding 70 miles per hour . . . . Because defendant . . . endangered every driver along that 8-mile stretch . . . the Court increases the offense level 1 point for each mile.

(J.A. at 126.) We do not believe that the district court's methodology provides a principled justification for departing by eight levels.

8

departure from the authorized guideline range, however, because the district court found that Canipe was partly "responsible for the aggressive driving behavior that led to his death." (J.A. at 126.) To our knowledge, no circuit or district court has determined whether an upward departure under § 5K2.1, p.s. is permitted when the decedent is partly responsible for his own death. We take the opportunity now and so hold.

It is black letter law that a defendant may be charged with homicide even if the decedent was an active participant in the activity that resulted in his death. See Wayne R. LaFave & Austin W. Scott, Criminal Law 481 n.40 (2d ed. 1986) (collecting cases). This well-settled rule is based upon the premise that criminal prosecutions are brought to punish criminal conduct and to protect the public, not to recompense the victim for his injuries. See id. As a result, the victim's role in the offense is generally not relevant.[7] See, e.g., State v. Plaspohl, 157 N.E.2d 579, 581 (Ind. 1959) (holding that negligence by the victim "does not bar an action against another for the wrong which he has committed against the peace and dignity of the state"). Thus, when a "death results from the reckless use of the highway, the fact that the deceased joined in the reckless activity does not negate the fact of the death, nor does it assuage the loss to the family of the deceased or the community." Id. More important, it does not negate the defendant's culpability. Accordingly, we hold that an upward departure under § 5K2.1, p.s. is permitted even when the decedent was an active participant in the activity that resulted in his death.[8]

_____

[7] Of course, a victim's role in the offense may provide the defendant with an affirmative defense, e.g., self-defense. Moreover, the victim's conduct may negate an element of the offense, e.g., causation.

[8] We recognize that a downward departure is encouraged in cases where "the victim's wrongful conduct contributed significantly to provoking the offense behavior." U.S.S.G. § 5K2.10, p.s. That acknowledgment, however, does not alter our conclusion that an upward departure under § 5K2.1, p.s. is permitted in this case. Where the victim is significantly responsible for the conduct that led to the offense, § 5K2.10, p.s. provides for a downward departure, not for absolution. Thus, a defendant is still accountable, albeit to a lesser degree, for an offense against a complicitous victim. Absent the upward departure pursuant to § 5K2.1, p.s., Terry's sentence would not have taken into account the additional death of Canipe. Therefore, while Canipe's role in the offense may limit the extent of the upward departure, it does not preclude a departure.

9

Because the additional death of Canipe was not already accounted for in the guideline under which Terry was sentenced, the district court did not abuse its discretion in departing upward pursuant to § 5K2.1, p.s. See Koon, 116 S. Ct. at 2045 (noting that a district court may exercise its discretion and depart if a factor upon which the Sentencing Commission encourages departure is not taken into account by the applicable guideline).

Although we conclude that Canipe's death may provide the basis for an upward departure, the district court, absent additional findings of fact, abused its discretion in departing upward by four levels. See Gary, 18 F.3d at 1130 (noting that the final step in our review is determining "whether the extent of the departure was an abuse of the district court's discretion"). In determining the extent of a departure under § 5K2.1, p.s., the Sentencing Commission provides the following guidance:

> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

U.S.S.G. § 5K2.1, p.s. In making its departure decision, the district court failed to consider any of the aforementioned factors.[9] In particu-

_____

[9] Despite the Government's contentions to the contrary, the district court did not depart upward four levels under § 5K2.1, p.s. because mul-

10

lar, the district court did not make any findings as to Terry's state of mind. As a consequence, it is not possible to determine the basis for (or the reasonableness of) the district court's decision to depart by four levels.

It is well established that the reasonableness of a departure may be evaluated by "treat[ing] the aggravating factor as a separate crime and ask[ing] how the defendant would be treated if convicted of it." United States v. Ferra, 900 F.2d 1057, 1062 (7th Cir. 1990). In addition, an upward departure should "not exceed the sentence that would

_____

tiple deaths resulted. Rather, the district court determined that a departure under § 5K2.1, p.s. was appropriate in light of "the additional death of Billy Canipe." (J.A. at 126.) Moreover, an upward departure under § 5K2.1, p.s. for multiple deaths would be inappropriate in this case. Here, two of the three deaths caused by Terry's reckless driving were taken into account by the involuntary manslaughter guideline. Thus, there was only one death warranting a departure under § 5K2.1, p.s. See United States v. Barber, 119 F.3d 276, 285 (4th Cir.) (en banc) (noting that an encouraged factor, e.g., death, may not be relied upon if already taken into account by the applicable guideline), cert. denied, 118 S. Ct. 457 (1997); cf. United States v. Carrion-Cruz , 92 F.3d 5, 6 (1st Cir. 1996) (permitting departure under § 5K2.1, p.s. for multiple deaths where four people died and applicable guideline (carjacking) did not account for deaths); United States v. Hui, 83 F.3d 592, 594 (2d Cir. 1996) (permitting departure under § 5K2.1, p.s. for multiple deaths where ten people died and defendant pleaded guilty to only one count of manslaughter). The Government's real complaint, it would seem, is that the grouping rules do not adequately take into account multiple deaths. In particular, the Government argues that a two-level increase is inadequate to account for the loss of a second life. Similarly, a one-level increase is inadequate to account for the loss of a third life. We note, however, that § 3D1.4 provides for a departure in cases where the grouping rules are inadequate in "ensuring appropriate additional punishment for the additional crime." U.S.S.G. § 3D1.4, comment. (backg'd). Without commenting upon the likelihood of success, the Government may argue on remand that an upward departure is warranted under § 3D1.4. See United States v. Apple, 962 F.2d 335, 337 (4th Cir. 1992) (holding that the scope of remand is determined by the Court of Appeals); see also United States v. Ynfante, 78 F.3d 677, 679-80 (D.C. Cir. 1996) (permitting Government on remand to argue theory not raised at initial sentencing).

11

result under the Guidelines if [the defendant] actually had been convicted of [the conduct underlying the departure]." United States v. Melton, 970 F.2d 1328, 1334 (4th Cir. 1992); accord United States v. Kikumura, 918 F.2d 1084, 1112 (3d Cir. 1990); Ferra, 900 F.2d at 1063; cf. United States v. Summers, 893 F.2d 63, 68 (4th Cir. 1990) (holding that a downward departure should not fall below the sentence that would result under the Guidelines absent the conduct underlying the departure). Had Terry been convicted of an additional count of involuntary manslaughter, he would have received only a one level increase under the Sentencing Guidelines' grouping rules. See U.S.S.G. § 3D1.4. In contrast, had Terry been convicted of second degree murder, his base offense level would have been 33. See U.S.S.G. § 2A1.2. Accordingly, the extent of the district court's departure turns on whether the recklessness exhibited by Terry was adequate to establish the existence of malice.[10] Because the district court made no such findings, we remand.

_____

**10** In United States v. Fleming , 739 F.2d 945 (4th Cir. 1984), we affirmed a conviction for second degree murder in a case bearing a striking similarity to the instant one. The defendant, driving approximately 80 miles per hour on the G.W. Parkway, lost control of his car on a sharp curve. The car slid across the median and into the southbound lanes, where it struck a car driven by Margaret Haley. Ms. Haley died before she could be removed from her car. The defendant was subsequently convicted of second degree murder. See id. at 947. In affirming the defendant's conviction, we noted the following:

> Proof of the existence of malice does not require a showing that the accused harbored hatred or ill will against the victim or others. Neither does it require proof of an intent to kill or injure. Malice may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm. To support a conviction for [second degree] murder, the government need only have proved that defendant intended to operate his car in the manner in which he did with a heart that was without regard for the life and safety of others.

Id. at 947-48 (citations and internal quotation marks omitted).

C.

Finally, the district court departed upward three levels under § 5K2.3, p.s. to take into consideration the psychological impact upon the families of the victims. Section 5K2.3, p.s. provides, in pertinent part, that a district "court may increase the sentence above the authorized guideline range" "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense." U.S.S.G. § 5K2.3, p.s. Although this factor is one on which the Sentencing Commission has encouraged departure, Terry contends that the district court abused its discretion in departing pursuant to § 5K2.3, p.s. because the members of the McBrien and Smyth families were not themselves victims. In the alternative, Terry argues that there was no evidence that they "suffered psychological injury much more serious than that normally resulting" when a family member is unexpectedly killed.

By § 5K2.3's own terms, it applies only to the victim(s) of the offense. The term "offense" is defined throughout the Sentencing Guidelines as "the offense of conviction." U.S.S.G. § 1B1.1, comment. (n.1(l)). Here, the offense of conviction is involuntary manslaughter. As a result, the district court's three-level upward departure can be sustained only if the family members of the individuals actually killed are themselves victims of the homicide. Terry contends that the term "victim" is limited to the direct victims of the offense of conviction. In contrast, the Government argues that the term should include both the direct and the indirect victims of the offense. For the reasons that follow, we conclude that the term includes both direct and indirect victims. Because, however, the families of Mr. Smyth and Mrs. McBrien are neither the direct nor the indirect victims of the offense of conviction, we hold that the district court abused its discretion in departing pursuant to § 5K2.3, p.s. **11**

_____

**11** Because we hold that the district court erred in departing under § 5K2.3, p.s. we need not, and do not, address Terry's alternative argument that the families in question did not "suffer[ ] psychological injury much more serious than that normally resulting from[the] commission of the offense." U.S.S.G. § 5K2.3, p.s. Moreover, we need not address Terry's contention that he did not receive "reasonable notice" under Rule 32 of the Federal Rules of Criminal Procedure that the district court was contemplating an upward departure under § 5K2.3, p.s.

Regrettably, neither § 5K2.3, p.s. nor § 1B1.1 defines "victim."**12** When Congress does not expressly define a statutory term or phrase, a court should "normally construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993); Burns v. Alcala, 420 U.S. 575, 580-81 (1975) (stating "that words used in a statute are to be given their ordinary meaning"). We believe that that axiom applies with equal force when the United States Sentencing Commission fails to define a term or phrase in the Sentencing Guidelines. See Mistretta v. United States, 488 U.S. 361, 412 (1989) (Scalia, J., dissenting) (observing that the Sentencing Guidelines "have the force and effect of law").

Black's defines "victim" as "[t]he person who is the object of a crime or tort, as the victim of a robbery is the person robbed." Black's Law Dictionary 1405 (6th ed. 1990). Under this definition, the victim of a homicide is the person killed, not a family member. As such, the definition in Black's is consistent with the meaning proposed by Terry. Not all dictionaries, however, define "victim" so narrowly. Webster's defines "victim" as "one that is . . . adversely affected by a force or agent." Webster's Ninth New Collegiate Dictionary 1314 (1983). Under this sweeping definition, anyone adversely affected by a homicide is a victim. Although very different in scope, both definitions are consistent with how the term "victim" is commonly employed.**13** Cf. Bailey v. United States, 116 S. Ct. 501, 506 (noting that the term "use" has several different meanings depending on the context). Because the term "victim" standing alone is ambiguous, we review how the term has been interpreted in other sections of the Guidelines. See Alexander S. v. Boyd, 113 F.3d 1373, 1384 (4th Cir. 1997) (noting that "identical terms within an Act should be given the same meaning"), cert. denied, 118 S. Ct. 880 (1998).

As noted above, the term "victim" is used throughout the Guidelines. See, e.g., § 3A1.1 (vulnerable victim); § 3A1.2 (official victim); § 3A1.3 (restraint of victim); § 3D1.2 (grouping rules); § 5K2.8, p.s.

---

**12** Section 1B1.1 defines "terms that are used frequently in the guidelines and are of general applicability." U.S.S.G. § 1B1.1, comment. (n.1).
**13** Although the most obvious understanding of "victim" is that given in Black's, it is not uncommon to hear a widow or an orphan described as the "real victim" of a homicide.

(extreme conduct); § 5K2.10, p.s. (victim's conduct). Like § 5K2.3, p.s., the "vulnerable victim" enhancement applies only to the victim(s) of the offense of conviction.**14** Unlike § 5K2.3, p.s., however, § 3A1.1 casts some light on the meaning of the term "victim." For example, the commentary to § 3A1.1 notes that a bank teller could be the "victim" of a bank robbery, see U.S.S.G. § 3A1.1, comment. (n.2), even though the bank, and not the teller, is the direct victim of the offense of conviction. Not surprisingly, in United States v. Blake, 81 F.3d 498 (4th Cir. 1996), we explicitly held that a vulnerable victim need not be the direct victim of the offense of conviction. Id. at 503-04 (holding that credit card holders were victims in scheme to defraud credit card issuers); accord United States v. Echevarria, 33 F.3d 175, 180-81 (2d Cir. 1994) (holding that patients of defendant who posed as doctor were victims even though it was the government and an insurance company that were defrauded); United States v. Bachynsky, 949 F.2d 722, 735-36 (5th Cir. 1991) (holding that doctor's patients were victims in case of insurance fraud). Similarly, we have upheld an enhancement under § 3A1.3, even though the "victim" was not the direct victim of the offense of conviction.**15** See United States v. Stokley, 881 F.2d 114, 116 (4th Cir. 1989). In contrast, the term "victim" under the grouping rules is limited to the "one person who is directly and most seriously affected by the offense."**16** U.S.S.G.

_____

**14** Section 3A1.1 provides:

> If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

U.S.S.G. § 3A1.1(b).

**15** Section 3A1.3 provides: "If a victim was physically restrained in the course of the offense, increase by 2 levels." U.S.S.G. § 3A1.3. In United States v. Stokley, 881 F.2d 114 (4th Cir. 1989), the defendant planted a bomb in the home of Deborah Legg. As Ms. Legg attempted to escape, the defendant blocked the doorway. The bomb exploded, injuring both Ms. Legg and the defendant. The defendant was subsequently convicted of destroying a building with an explosive device. Although not the direct victim of the offense of conviction, we nevertheless upheld a departure under § 3A1.3. See id. at 115-17.

**16** Under the Guidelines' grouping rules, counts involving different victims cannot be grouped together. U.S.S.G. § 3D1.2(a).

15

§ 3D1.2, comment. (n.2) (emphasis added). As a consequence, for the purpose of § 3D1.2, "[t]he term `victim' is not intended to include indirect or secondary victims." U.S.S.G. § 3D1.2, comment. (n.2).

Although § 3D1.2's narrow definition of "victim" comports with that given in Black's and urged by Terry, we do not believe that it should apply here. First, the very fact that the Sentencing Commission found it necessary to expressly exclude "indirect victims" from the definition of "victim" in § 3D1.2 strongly suggests that the term ordinarily includes them. Second, the context in which the term "victim" is used in § 5K2.3 is nearly identical to the context in which it is used in §§ 3A1.1 and 3A1.3. Accordingly, after carefully reviewing the overall framework of the Sentencing Guidelines, especially the additional guideline sections employing the term, we hold that § 5K2.3, p.s. is not limited to the direct victim of the offense of conviction. Cf. United States v. Okane, 52 F.3d 828, 835 (10th Cir. 1995) (holding that "victim" in § 5K2.3, p.s. included a bank's employees and customers).

Although a victim need not be the direct victim of the offense of conviction, we do not believe, as the Government contends, that every individual adversely affected by the offense of conviction is an indirect victim. Rather, an indirect victim must have some nexus or proximity to the offense. Put simply, an individual is an indirect victim because of his relationship to the offense, not because of his relationship to the direct victim. Bank tellers and patrons are indirect victims in a bank robbery, see U.S.S.G. § 3A1.1, comment. (n.2), credit card holders are indirect victims in a scheme to defraud their credit card issuers, see Blake, 81 F.3d at 503-04, and patients are indirect victims in a plan to defraud their insurance carrier, see Echevarria, 33 F.3d at 175, because of their nexus or proximity to the offense of conviction. Here, however, there is no evidence that the families in question had any relationship to the offense beyond their relationship to the direct victims.[17] Because we conclude that the families of Mr. Smyth and Mrs. McBrien are not victims of the offense of conviction, the

_____

[17] For instance, a family member might be an indirect victim if she had been involved in the accident as either a passenger or a bystander.

16

district court abused its discretion in departing upward by three levels under § 5K2.3, p.s.**18**

III.

Although the district court relied upon three separate encouraged factors in seeking to justify an upward departure, each encouraged factor was either already taken into account in the applicable guideline, as in the case of § 5K2.14, p.s. (endangering public safety), not applicable to the facts of this case, as in the case of § 5K2.3, p.s. (extreme psychological injury to the victim of the offense), or not appropriately applied, as in the case of § 5K2.1, p.s. (death). Accordingly, we vacate the sentence imposed and remand for resentencing.

VACATED AND REMANDED

_____

**18** In a case directly on point, the Ninth Circuit held that § 5K2.3, p.s. applies "only to the direct victim of the crime and not to others affected by the crime, such as the [direct victims'] family." United States v. Hoyungowa, 930 F.2d 744, 747 (9th Cir. 1991). Although we disagree with the Ninth Circuit's conclusion that § 5K2.3, p.s. applies only to the direct victim of the offense of conviction, we agree with its holding.