UNITED STATES of America,
Plaintiff–Appellee,

v.

James Dalton BELL, Defendant–
Appellant.

No. 01–30303.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Filed Sept. 19, 2002.

Peggy Sue Juergens, Seattle, WA, for the defendant-appellant.

Steven L. Lane, United States Department of Justice, Criminal Division, Appellate Section, Washington, DC, for the plaintiff-appellee.

Before HAWKINS and GOULD, Circuit Judges, and WARE,* District Judge.

## OPINION

MICHAEL DALY HAWKINS, Circuit Judge.

Defendant–Appellant James Dalton Bell ("Bell") appeals his jury trial conviction and ten-year sentence for interstate stalking and using the facilities of interstate commerce for interstate stalking in violation of 18 U.S.C. §§ 2261A and 2261A (2)(B)(i), alleging error in the handling of his efforts to obtain substitute counsel, the giving of certain jury instructions and sentencing. We have jurisdiction under 18 U.S.C. § 1291.

### Facts & Procedural History

The proceedings at issue arise from Bell's long and troubled history with the

---

* Honorable James Ware, United States District Judge for the Northern District of California, sitting by designation.

government and in particular the Internal Revenue Service ("IRS"). Bell first came to the attention of authorities in 1996 in connection with his Internet posting of home addresses of IRS employees laced with veiled harassment threats and the activities of the Multnomah County Common Law Court ("MCCLC"), a group of citizens with grievances against government officials. At an MCCLC meeting in early 1997, Bell distributed an essay entitled "Assassination Politics" in which he proposed the development of a system to solicit the killing of government employees using encrypted Internet messages. Bell also posted the essay online.

Words turned to action following the February 1997 seizure of Bell's automobile for unpaid federal taxes. Bell responded by contaminating the Vancouver, Washington IRS office with a powerful, foul-smelling chemical, forcing a number of government workers to leave the premises. A subsequent search of Bell's living area in the basement of his parents' home produced a variety of dangerous chemicals, including acid, cyanide and a chemical variant of the dangerous nerve agent sarin— all apparently obtained through the use of false Social Security numbers. Bell's computers also contained the names and home addresses of dozens of IRS employees and messages indicating they were intended for "later targeting."

In July 1997, Bell entered a guilty plea to resulting charges of obstructing the administration of internal revenue laws and using false Social Security numbers. Sentenced to eleven months, Bell briefly exited federal custody in June 1998, only to quickly violate the terms of his supervised release and be returned to prison. In April 2000, shortly before he was released from custody, Bell told a reporter for an Internet magazine that he planned revenge on "the system that had imprisoned [him]." Upon his release from prison, Bell promptly began gathering information about government officials involved in his 1997 prosecution. His efforts included obtaining motor vehicle records under false pretenses, trespassing, and stealing mail.

On October 23, 2000, Bell left his residence in Washington and drove to Eagle Creek, Oregon, where he trespassed on the property of a man named Chris Groener. The property had previously belonged to ATF Agent Mike McNall. Bell then drove to Tualatin, Oregon, where he went to a house that he believed belonged to Treasury Special Agent Jeff Gordon, though in reality the house belonged to a different Jeff Gordon. He stole mail from the mailbox, including an item identifying Joshua Gordon as Jeff Gordon's son. Later that night, Bell posted an e-mail online threatening Joshua.[1] Two days later, Bell sent a threatening fax to IRS Agent Gordon.

A November 6, 2000, search of Bell's residence produced many of the same dangerous chemicals found three years earlier. Agents also placed a court-authorized tracking device on Bell's motor vehicle and monitored his movements.[2] When a newspaper article about the search appeared, Bell confirmed that he had visited the homes of government agents to "let them know that surveillance can be done in both directions" and stated that "if you think

---

1. Bell obtained the address for the home from the motor vehicle information he had earlier obtained.

2. This surveillance revealed a return visit to the Groener property on November 6, 2000, during which Bell entered the garage and left notes on the vehicles.

this is going to stop me, baloney." Bell was arrested on November 17, 2000 and indicted twelve days later on two counts of interstate stalking. That indictment was superceded on January 25, 2001, charging a total of five counts regarding interstate stalking and related activity, including a violation of an amended version of 18 U.S.C. § 2261A.

Following a six-day jury trial, Bell was convicted on two of the five counts, the jury unable to reach a verdict on the remaining counts. At sentencing, the district court accepted the recommendation of the Probation Office and departed upward five levels, concluding that a number of factors took Bell's case outside the heartland of the charges of which he stood convicted. The district court then sentenced Bell to 60 months on each count of conviction, to be served consecutively.

## Analysis

### Substitute Counsel

██ Bell was initially represented by Wayne Fricke and then Robert Leen, his sixth and seventh court-appointed counsel since his 1997 prosecution.[3] Continuing his troubled history with counsel, Bell demanded that Leen pursue an investigation to establish the existence of a widespread government conspiracy against him. Leen refused and subsequently requested a hearing to discuss Bell's representation, suggesting that the court consider permitting Bell to represent himself. Bell responded with a letter to the district court stating that he did not want to proceed pro se, but wanted new counsel appointed. A

hearing was held at which Bell spoke at length concerning his complaints about Leen's representation. Bell's presentation made clear that his problem with Leen was not one of communication or quality of representation, but Leen's refusal to pursue Bell's conspiracy theories. The district court elected to defer consideration of Bell's request for new counsel pending a determination of Bell's competence.

A second hearing was held one month later with the district court in possession of a report on Bell's competency to stand trial. After listening to and questioning Bell at length as to the reasons for dissatisfaction with Leen, and considering Bell's history with court-appointed counsel, the district court denied the request for new counsel. The court also offered Bell the option of representing himself or retaining counsel at his own expense, both of which he refused.

On the brink of trial, Leen moved to withdraw and to continue the trial to allow the appointment of new counsel. Taking these matters up on the first scheduled day of trial, the district court listened to the concerns of Bell and Leen, but concluded once again that the request was not based on Leen's ability to effectively represent Bell and denied the motion.[4]

██ We review denial of the motion for substitution of counsel for an abuse of discretion. See United States v. Smith, 282 F.3d 758, 763 (9th Cir.2002). Focusing on the adequacy of the court's inquiry and the nature of the alleged conflict between Bell and Leen, see United States v. Coro-

---

**3.** Bell was represented by five separate counsel in connection with his 1997 prosecution, appeal and supervised release revocation. Each of these attorneys wound up on Bell's

Internet page as involved in a conspiracy to deny him his rights.

**4.** Leen was permitted to withdraw at the conclusion of trial and sentencing.

*na–Garcia,* 210 F.3d 973, 976 (9th Cir. 2000), we are not persuaded that Bell was improperly denied new court-appointed counsel.[5] The record reveals that the district court carefully considered each such request, holding three separate hearings on the subject and concluding that any dissatisfaction arose from the refusal to accommodate demands to conduct a far reaching investigation into matters having nothing to do with the merits of the case. The district court also took care to monitor the proceedings throughout the trial to insure that Bell and his counsel were freely communicating and cooperating in an appropriate manner. Neither Bell nor his counsel disputed the district court's on-the-record observations in this regard. We find no abuse of discretion here.

### Jury Instructions

#### 1. Intent

Bell contends that the district court failed to properly instruct the jury on the mens rea element on the convicted counts, interstate stalking and use of facilities of interstate commerce for stalking. Bell argues that the court failed to give a specific intent instruction. He also argues that the court should have provided a further definition of the particular statutory intent—for example, on Count III, using the words "knowingly acted with the intent and purpose" instead of "with the intent and purpose" as the instruction given read.

■ The district court gave the Ninth Circuit Model Instruction with respect to the convicted counts. Both the manual accompanying the Model Instructions and our case law discourage the use of generic specific intent instructions. *See Ninth Circuit Manual of Model Criminal Jury Instructions* 5.4 (1995); *United States v. Johnson,* 956 F.2d 197, 199–200 (9th Cir. 1992). The preferred practice, which the district court followed here, is the giving of an intent instruction that properly reflects the intent requirements of the charged offense. Further, a specific intent instruction might · have confused the jury into believing that Bell must have intended to violate a specific law rather than committing an act with the intent to harass a particular government agent. The instructions given were properly tailored to the charged offense and the district court was not obligated to do more.

#### 2. Course of Conduct

■ Bell contends that the instruction given on Count III (use of facilities of interstate commerce for interstate stalking) failed to include the "course of conduct" element of the charged offense. *See* 18 U.S.C. § 2261A(2)(B). Bell's precise argument is that the statute requires proof of use of interstate commerce facilities on more than one occasion.

■ Because Bell did not object to the form of the instruction given, we review for plain error; an error so clear as to affect substantial rights that is not only prejudicial, but one that seriously affects the fairness or integrity of the proceedings. *United States v. Dorri,* 15 F.3d 888, 891 (9th Cir.1994). In conducting this analysis, we must consider all the circumstances of the trial including the strength of the evidence against the defendant. *United States v. Chambers,* 918 F.2d 1455, 1459 (9th Cir.1990).

---

**5.** We also recognize that *Corona–Garcia* identifies timeliness as an additional factor, but the parties do not dispute that Bell's repeated raising of the counsel issue was timely.

We agree that the omission of the course of conduct element from the instruction on Count III was error. *See United States v. Hove,* 52 F.3d 233, 236 (9th Cir.1995). The phrase is clearly present in the statute and is an element of the offense. *See* 18 U.S.C. § 2261A(2)(B) (2000). The omission substantially affected Bell's rights by permitting a conviction without the finding of a statutory element. *See United States v. Mendoza,* 11 F.3d 126 (9th Cir.1993). But that does not end our inquiry—the failure to instruct on an element of an offense may be harmless where it is clear beyond a reasonable doubt that a rational jury would have convicted Bell absent the error. *United States v. Gracidas–Ulibarry,* 231 F.3d 1188, 1197 (9th Cir.2000) (en banc).

We agree that the 2000 amendments to 18 U.S.C. § 2261A define "course of conduct" to mean a pattern of conduct composed of two or more acts. The question is whether the sending of the fax to Agent Gordon on October 31, 2000—occurring after the effective date of the amended statute—can be combined with acts taking place before that date to enable a rational jury to find the required course of conduct. Bell is charged with knowledge of the amended statute as of its effective date, yet he continued his actions as part of a continuum that began with thinly veiled Internet threats and ended with the threatening fax to Agent Gordon. Context is everything in threat jurisprudence. *See Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 290 F.3d 1058, 1071 (9th Cir. 2002) (en banc).

While we are not persuaded by the government's argument that the preparation and sending of the Gordon fax should be considered separate acts, we conclude that the context and scope of Bell's actions, culminating in the transmission of the threatening fax, meet the course of conduct requirement even though some acts occurred prior to the effective date of the statute and that a rational jury, properly instructed, would have so found.

### Upward Departure

Relying on *United States v. Sablan,* 114 F.3d 913 (9th Cir.1997) (en banc), Bell argues that the district court erred in failing to consider whether its stated additional reasons for departure are encouraged, discouraged, or forbidden by the Sentencing Guidelines. Bell does not contest the five bases detailed in the Presentence Report ("PSR") and expressly adopted by the district court (significant disruption of government function, property damage/loss not accounted for in offense level, commission of crimes not in offense level, long history of harassment of others, and obstructive behavior). What Bell does contest is the district court's embrace of the PSR's additional justification for the five-level upward departure: that past sanctions have not effectively curbed Bell's unlawful behavior—indeed his actions have progressed from nuisance to dangerous threat.

But *Sablan* does not require a precise, formulaic analysis of the relationship between factors relied upon for departure and their appearance in the Guidelines. It is sufficient that the district court has avoided "double counting"—repeating the use of a factor previously accounted for in the offense level or other departure factors. We conclude that the district court properly considered a factor fundamentally different from those already considered. Moreover, the additional factor is one specifically recognized in U.S.S.G. § 5K2.14 (significant danger to public health or safety). *See also United States v. Gayou,* 901 F.2d 746, 747–49 (9th Cir.1990) (consideration of past or future endangerment proper). And, of course, under both *Sablan*

and *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), a district court may always take into consideration those factors that take a case out of the heartland of the specific offense.

This leads us to Bell's related argument that the upward departure was in any event unreasonable. We disagree. The specific factors relied upon by the district court for taking Bell's conduct outside the heartland of stalking offenses also provide ample support for the reasonableness of the departure: (1) A seventeen-year behavioral history; (2) done with increasing intensity; (3) without regard to sanctions; (4) accompanied by possession of deadly chemicals and nerve agents; (5) carried out pursuant to an intense fixation on particular victims; and (6) motivated by a delusional belief in a conspiracy against him. The upward departure was both proper and reasonable.

**AFFIRMED.**