**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William Thomas SEMSAK,**
**Defendant–Appellant.**

No. 02–30153.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 2003.

Filed July 28, 2003.

Robin B. Hammond, Federal Defenders of Montana, Billings, MT, for the appellant.

C. Ed Laws, United States Attorney's Office, Billings, MT, for the appellee.

Before B. FLETCHER, BRUNETTI, and McKEOWN, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge.

This case involves the fatal combination of alcohol and an eighteen-wheel tractor-trailer. William Thomas Semsak, drunk behind the wheel of his big-rig truck, collided with a car, killing its driver. Semsak pled guilty to involuntary manslaughter and now appeals his sentence. The district court departed upward four levels in sentencing Semsak, reasoning that the size of the truck and the recklessness of Semsak's driving took the case outside the heartland of the offense guideline. *See Koon v. United States,* 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Because the district court interpreted the guidelines correctly, we affirm.

### BACKGROUND

Late one night in July 2001, Semsak drove an eighteen-wheel tractor-trailer on a stretch of highway on the Northern Cheyenne Indian Reservation in Montana. Semsak's truck carried lumber and weighed 78,220 pounds. He had a bottle of Everclear liquor with him in the cab, and his blood-alcohol content was later measured at 0.17 percent—nearly twice the legal limit in Montana.

Other drivers saw Semsak's truck weaving across the highway, kicking up dust as it wandered to the opposite shoulder, its trailer fishtailing. One family followed the truck for eight miles, flashing their headlights and hazard lights, trying to warn other drivers and get Semsak to pull over. The driver watched Semsak's rig run about twenty cars off the highway and narrowly miss colliding head-on with two other trucks. Another driver also tried to get Semsak's attention, but could not catch up with him. These efforts were to no avail. Ultimately, Semsak's truck hit a passenger car, running over the car, dragging it underneath, and crushing it almost beyond recognition. That car was driven by Marcus Sooktis, who died instantly.

Semsak was indicted for involuntary manslaughter and pled guilty after striking a plea bargain.[1] In calculating the Criminal History Category, the district court assigned a three-point increase for each of two prior state convictions for which Semsak had been incarcerated less than fifteen years before the date of the accident, in accord with U.S.S.G. § 4A1.2(e)(1). The court calculated Semsak's base offense level at 14 for reckless conduct resulting in involuntary manslaughter. *See* U.S.S.G. § 2A1.4(a)(2). The court observed that he had "never

---

**1.** Federal courts have exclusive jurisdiction over cases involving involuntary manslaugh- ter where the conduct occurs in Indian country. *See* 18 U.S.C. § 1153(a).

seen, in a case since I've been on the bench, the additional factors besides the reckless disregard," and that he had "never seen a case where somebody has taken the additional responsibility of operating an 80,000 pound vehicle ... and engaged in reckless disregard for life. That's what takes it out of the heartland, or at least one of the things that takes it out of the heartland." Based on this reasoning, the court departed upward four levels. The court then sentenced Semsak to 33 months, the top of the guideline range. Semsak appeals the sentence.

## DISCUSSION

### I. UPWARD DEPARTURE

Semsak challenges the district court's decision to depart upward. The first question is our standard of review. Before Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108–21, 117 Stat. 650 (2003), we reviewed such departures for an abuse of discretion. *See United States v. Sablan*, 114 F.3d 913, 916 (9th Cir.1997) (en banc) (citing *Koon*, 518 U.S. at 100, 116 S.Ct. 2035). Section 401(d) of the PROTECT Act now requires that we review de novo whether the district court's departure was based on proper factors. *See* 18 U.S.C. § 3742(e). Because we would affirm under either a de novo standard or an abuse of discretion standard, like several other circuits we decline to decide whether the PROTECT Act applies to appeals—such as Semsak's—that were pending on the date of its enactment, April 30, 2003.[2] *See United States v. Camejo*, 333 F.3d 669, 2003 WL 21467217, at *4–*5 (6th Cir. 2003); *United States v. Chesborough*, 333 F.3d 872, 2003 WL 21467512, at

*1 (8th Cir. 2003); *United States v. Tarantola*, 332 F.3d 498, 2003 WL 21347112, at *2 (8th Cir. 2003); *but see United States v. Jones*, 332 F.3d 1294, 2003 WL 21399025, at *2 (10th Cir. 2003) (applying de novo standard of review to a sentencing appeal pending as of the passage of the PROTECT Act).

In assessing the district court's authority to depart upward, we must determine whether the bases for departure were already taken into account by the offense guideline. *See* 18 U.S.C. § 3553(b)(1) (authorizing a departure only where the "court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described"); *United States v. Bell*, 303 F.3d 1187, 1192 (9th Cir.2002) (holding that a district court should avoid "repeating the use of a factor previously accounted for in the offense level"). The guideline for involuntary manslaughter sets a base offense level of 10 for criminally negligent conduct and 14 for reckless conduct. U.S.S.G. § 2A1.4(a). The district court determined that Semsak's conduct was reckless and set the base offense level at 14. Application Note 1 of this guideline states that "[a] homicide resulting from driving ... while under the influence of alcohol ... ordinarily should be treated as reckless." U.S.S.G. § 2A1.4, Application Note 1. Nonetheless, concluding that this offense guideline did not contemplate "reckless conduct with an 80,000 pound vehicle," the district court added four levels on the basis of U.S.S.G. § 5K2.14, which provides for an increase "[i]f nation-

---

**2.** The PROTECT Act also requires us to review de novo whether the district court has complied with the Act's requirement that it state its reasons for a departure "with speci-

ficity" in the order of judgment. 18 U.S.C. § 3553(c)(2); 18 U.S.C. § 3742(e)(3)(A). Here, the district court stated specific reasons for the departure in the order of judgment.

al security, public health, or safety was significantly endangered."

Semsak argues that because drunk, reckless driving always creates a threat to public safety, the involuntary manslaughter offense guideline already encompassed his conduct. This proposition may be true in most vehicular involuntary manslaughter cases. However, a factor accounted for by the guideline may still justify an upward departure if it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035.

Especially where alcohol is involved, driving may become so "reckless" that the term does not begin to describe the magnitude of the conduct. *See Jones*, 332 F.3d 1294, 2003 WL 21399025, at *4; *United States v. Terry*, 142 F.3d 702, 706–07 (4th Cir.1998); *United States v. Whiteskunk*, 162 F.3d 1244, 1252–53 (10th Cir.1998). In *Whiteskunk*, the Tenth Circuit held that "excessive recklessness" posing a threat to public safety could justify an upward departure from a drunk driver's base offense level for involuntary manslaughter. 162 F.3d at 1252. Reasoning that "recklessness" covers a broad spectrum of behavior, the Tenth Circuit concluded that district courts should be free to depart if the facts indicate "a degree of recklessness that falls on the periphery of reckless conduct." *Id.* at 1251. Among the factors justifying the upward departure were the defendant's high blood-alcohol level, a prior conviction for drunk driving that had put her on notice of the dangerousness of her conduct, and several opportunities to avoid the accident on that day, including being refused service at a bar, having her keys taken from her, and narrowly avoiding a collision with another vehicle. *Id.* at 1252–53; *see also Jones*, 332 F.3d 1294, 2003 WL 21399025, at *4 (holding that a high blood-alcohol content and prior drunk driv-

ing convictions justified an upward departure on extreme recklessness and public safety grounds).

In both *Whiteskunk* and *Jones*, the Tenth Circuit upheld upward departures. In contrast, the Fourth Circuit reversed and remanded an eight-level departure in a case involving a "cat and mouse" high-speed duel. *See Terry*, 142 F.3d at 706. The court reversed not because drunk driving cannot be a basis for departure, but rather because the district court failed to make a finding that the defendant's conduct was "outside the 'heartland' of situations encompassed by the applicable guideline." *Id.* at 707. Acknowledging that "reckless driving was already taken into account by the involuntary manslaughter guideline," the court remanded "so that the district court may determine in the first instance whether the danger created by Terry's reckless conduct was outside the 'heartland' of the typical involuntary manslaughter case involving reckless driving." *Id.* at 706–07. In Semsak's case, the district court made precisely such a finding.

 Although we hesitate to label any involuntary manslaughter case as ordinary, we agree with the district court that, in the parlance of the Sentencing Guidelines, this is no ordinary drunk-driving case. Semsak's behavior pushed the upper limits of recklessness. Like the defendant in *Whiteskunk*, he had a high blood-alcohol level, drove on the wrong side of the road, and ignored repeated warnings and efforts to prevent the accident. Exacerbating these factors is the use of an 80,000–pound, eighteen-wheel truck requiring training and a special license to drive. The unique responsibility Semsak bore when driving such a massive vehicle magnified his recklessness in getting behind the wheel while drunk. Taken together, the circumstances here make this an extraordinary case.

Semsak points out that were he driving a normal passenger car, or a sport utility vehicle, the tragic outcome may have been the same. No one knows, but it hardly matters. The instrumentalities of death are very different—a passenger car is not an eighteen-wheeler. In the hands of a drunk driver, a big-rig truck is a far deadlier weapon, capable of inflicting greater havoc and ruining more lives, than an ordinary car. It was this higher order of threat to public safety that compelled the district court to depart upward under U.S.S.G. § 5K2.14. Because Semsak could have been sentenced for reckless involuntary manslaughter even were he not driving an eighteen-wheel truck in such an extremely hazardous way, we agree that " 'the guideline's base offense level' " did not " 'capture the full extent of the wrongfulness of such behavior.' " *United States v. Archdale*, 229 F.3d 861, 869 (9th Cir. 2000) (quoting *United States v. Reese*, 2 F.3d 870, 895 (9th Cir.1993)).

Semsak also argues that the district court failed to articulate the reasons for the extent of the departure. Although we no longer require a district court to analogize to other guidelines, it must explain the basis for the extent of departure "in sufficiently specific language to allow appellate review." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir.2000) (en banc) (internal quotation marks omitted); *see also Sablan*, 114 F.3d at 919 (rejecting a "mechanistic approach" requiring a comparison to analogous guideline provisions). Here, although the judge did not explain separately why he chose to depart four levels, he engaged in an extended colloquy with defense counsel and made specific factual findings as to the degree of recklessness involved. The same factors that support the decision to depart, if clearly articulated, may also provide adequate justification for the extent of departure. *See Bell*, 303 F.3d at 1193; *see also Sablan*, 114 F.3d at 919 ("[W]here ... a district

court sets out findings justifying the magnitude of its decision to depart and extent of departure from the guidelines, and that explanation cannot be said to be unreasonable, the sentence imposed must be affirmed."). The district court's recounting of Semsak's extreme recklessness supports both the decision to depart and the extent of departure.

When we compare the facts here to other reckless driving cases, the four-level departure does not strike us as excessive. *See, e.g., Terry*, 142 F.3d at 707 n. 5 & n. 6 (rejecting the district court's rationale for an eight-level increase, instead observing that the two-level increase for reckless endangerment in U.S.S.G. § 3C1.2 "may provide a useful guide" for determining the extent of upward departure for extreme recklessness while driving, and listing cases). The guidelines call for a four-level increase, for example, when a "dangerous weapon" is used in the commission of an assault or robbery. *See* U.S.S.G. § 2A2.2(b)(2)(B); U.S.S.G. § 2B3.1(b)(2)(D); *Jones*, 332 F.3d 1294, 2003 WL 21399025, at *7–*8 (analogizing a drunk driver in a Ford Bronco to a "dangerous weapon" and concluding that a four-level increase was appropriate). But even if we had our doubts, the district court's "institutional advantage over [the] appellate court[ ] in making these sorts of determinations" calls for considerable deference to its assessment of Semsak's behavior. *Koon*, 518 U.S. at 98, 116 S.Ct. 2035 (quoted in *United States v. Roston*, 168 F.3d 377, 378 (9th Cir.1999)). The district court made his decision after carefully considering the unique circumstances of the case. The upward departure was justified.

## II. CRIMINAL HISTORY CATEGORY

 Semsak challenges the calculation of his Criminal History Category under

U.S.S.G. § 4A1.1(a). The court added three points for each of Semsak's two prior convictions because the sentences exceeded thirteen months and they resulted in his incarceration less than fifteen years before the instant offense.[3] *See* U.S.S.G. §§ 4A1.1(a), 4A1.2(e)(1). Although Semsak was initially released from his imprisonment for the original crimes more than fifteen years prior to the drunk-driving accident in this case, a parole revocation for those original crimes returned Semsak to prison less than fifteen years before the accident. *See* U.S.S.G. § 4A1.2(k)(2)(A) ("Revocation of ... parole ... may affect the points for § 4A1.1(e) in respect to the recency of last release from confinement."). Because the original sentences were for separate, unrelated offenses, each adds three points. *See* U.S.S.G. § 4A1.2(a)(2).

Semsak argues, based on Note 11 of § 4A1.2, that three points should be added for only one of the two sentences. Note 11 states that, "[w]here a revocation applies to multiple sentences, and such sentences are counted separately under § 4A1.2(a)(2), add the term of imprisonment imposed upon revocation to the sentence that will result in the greatest increase in criminal history points." U.S.S.G. § 4A1.2, Application Note 11.

We are not persuaded by Semsak's argument. Note 11 addresses only the points assigned due to the *length* of sentences, not the *recency* of the sentences. U.S.S.G. § 4A1.2, Application Note 11. Note 11 discusses a situation where revocation makes sentences longer than they originally would have been, thus adding to the number of points assigned for each sentence. *See United States v. Flores*, 93 F.3d 587, 592 (9th Cir.1996); U.S.S.G. § 4A1.2(k)(1). In *Flores*, we noted with

approval the Sixth Circuit's construction of Application Note 11, that "the sentencing court can tack the probation revocation sentence to any one of" identical sentences to add to the score, but the other sentences "remain unaffected." *Id.* (quoting *United States v. Streat*, 22 F.3d 109, 111 (6th Cir.1994)).

But Note 11 does not address Semsak's issue—whether the revocation makes the original sentence fall within the fifteen-year period. Because both of Semsak's original convictions exceeded thirteen months, he was already maxed out at three points per sentence, so a parole revocation could not have added points to his criminal history score for those sentences. The revocation only affected whether the sentences fell within the fifteen-year period. Under the plain meaning of U.S.S.G. § 4A1.2(e)(1) and § 4A1.1(k)(2)(a), both sentences fell within that period, and the district court correctly added three points for each conviction.

**AFFIRMED.**

---

3. A third conviction for a separate offense was listed in the Presentence Report, but the district court declined to add points for this sentence due to lack of supporting documentation. The government did not appeal this ruling.